**JADIN v. UNITED STATES et al.**
Civil Action No. 4229.

District Court, E. D. Wisconsin.
Nov. 13, 1947.

Alex Wilmer and North, Bie, Welsh, Trowbridge & Wilmer, all of Green Bay, Wis., for plaintiff.

Timothy Cronin, U.S.Atty., and E. J. Koelzer, Asst.U.S.Atty., both of Milwaukee, Wis., for the United States.

Myrtle Wabschall, in pro. per.

DUFFY, District Judge.

Plaintiff herein seeks recovery on a policy of national life insurance taken out by Daniel Albert Wabschall who served in the Marine Corps in World War II. In February, 1942, Wabschall signed an application for such insurance, designating the plaintiff as his beneficiary, and stating the relationship of plaintiff was that of "legal guardian." The spaces in the application form were filled in by typewriter and a Lieutenant Freeman signed as a witness and adviser. As the designation of "gen-

eral guardian" was ineffective under the Act, 38 U.S.C.A. 801 et seq., plaintiff seeks to qualify as one standing in loco parentis. Section 801(f) of the Act provides that the term "parent" includes persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year.

For a number of years plaintiff and his wife have operated a boarding home for Indian children on their farm. In June, 1935, under a contract with the Tomah Indian Agency, Daniel Wabschall, then ten years of age, and his younger sister, Bernadine, both of part Chippewa blood, were placed with the Jadins, who received $22 a month for the care of each child, which sum was their compensation for the children's board, lodging and clothing. Later the contract rate was reduced to $19 per month, with the Indian Agency to furnish the clothing.

Although the arrangement began as a business proposition, a growing bond of affection united Mr. and Mrs. Jadin and Daniel and his sister into a true family relationship. The following incidents show that the mere business relationship had ceased and that the Jadins treated and regarded the Wabschall children with the same warmth of parental interest natural mothers and fathers show their own. The public school was only slightly more than one mile from the Jadin farm, while the parochial school was at least two miles distant. Daniel and his sister could have readily walked to the public school on most school days, and it would have been much more convenient for Mr. Jadin to have enrolled the children there. However, from various standpoints, it seemed advisable to send these children to the parochial school, and Mr. Jadin purchased a bicycle for each of them to use. In addition, on inclement days he took them to school and called for them. On the various holidays plaintiff provided suitable celebration at his home, which adds so much to happy childhood. When Daniel attended East High at Green Bay, some nine miles distant, plaintiff bought a Model A Ford for him, and later when he worked out the summer before he enlisted, plaintiff told him he could

come home at any time if he did not like his work. Although the government had discontinued payments for Bernadine's support, plaintiff sent her through her senior year at high school at his own expense. When Daniel enlisted in the Marine Corps, he asked the plaintiff, whom he considered his foster father, to sign the consent for his enlistment, and he designated the plaintiff as the person to be notified in case he was killed or wounded. As Daniel left for the service, plaintiff gave him a present of $50, just as any devoted natural father might do.

After enlisting Daniel wrote a number of letters to the plaintiff and his wife. He showed a keen interest in the affairs of the farm, and asked many questions, such as how many cows were then on the farm and how many cans of milk were obtained daily. In one letter he mentions going to church every Sunday. He expressed pleasure at knowing the victrola in the Jadin home was again in working order. In another letter he wrote, "I took out $5000 worth of life insurance. Paul (the plaintiff) is the beneficiary in case anything happens to me."

Just as it gnawed at the heart of every boy in service longing for home, nostalgia assailed Daniel when he recalled the happy times he had had at the only real "home" he had known, that of his foster father. On June 16, 1943, he wrote: "I can well imagine the beauty of everything in bloom, with the cows grazing in the pastures, etc. I sure wish I could get back there soon, but I think it will be some time before that's possible. I'm sure that with all your prayers I'll be *home* sooner." On July 2, 1943, eight days before he was killed in action, he wrote. "I know I'll be *home* by Christmas, but of what year I can't know." On may 26, 1943, he wrote, "How is everything back *home*?" (Emphasis supplied)

■ The court will take judicial notice that men in the armed forces were strongly urged to take out policies of national life insurance. Daniel took out such a policy apparently after having been advised by Lieutenant Freeman that the plaintiff could be designated as his beneficiary. It is obvious that Daniel would not have designated his natural father, who had deserted him

many, many years before and whose whereabouts were unknown, nor his natural mother who, though living, had shown absolutely no interest in Daniel or his sister. Although not clear from the evidence, it is undoubtedly the fact that Daniel had not heard from or seen his mother for the eight years he had been living with the plaintiff, and it is quite apparent that she had no concern or motherly love for her children.

■ While it was and is highly commendable for the government to provide national life insurance at cost to the men and women serving in the armed forces, nevertheless it was Daniel's money which paid for the premiums on the insurance policy in question. The statute authorizing national life insurance should be liberally construed in favor of the insured, and to carry out his intentions. McClure v. United States, 9 Cir., 95 F.2d 744; Meisner v. United States, D. C., 295 F. 866.

■■ I recognize that some courts have narrowly construed the words, "in loco parentis." They have placed common law limitations upon them. Niewiadomski v. United States, 6 Cir., 159 F.2d 683. It also has been held that financial support of the minor is essential to the relationship. Strauss v. United States, 2 Cir., 160 F.2d 1017. The statute itself does not define the term, "in loco parentis," but it seems to me Congress intended to give the serviceman a broad discretion in naming as his beneficiary a person in whose home he had lived for at least one year as a member of the family. I believe that the family relationship rather than the assumption of legal responsibility for support is the important factor to be considered.

In Zazove v. United States, 7 Cir., 156 F.2d 24, 25, the Circuit Court of Appeals for this circuit adopted a sensible and realistic interpretation of "in loco parentis." That court said 156 F.2d at page 26: " * * * Did Congress use the words in loco parentis as descriptive words, or did it use the words with the common-law limitation upon them, namely that the relation could not exist unless the insured were a minor? We find no limitation in the words of Congress. We think they were used as descriptive words and were not to be restricted to the 'stick in

592

the bark' legal connotations usually attached at common law." And, 156 F.2d at page 27: "One standing in the place of a parent may give more than material things to that relationship. Not only material help may flow from such a relationship. Some of the most worth-while, precious and cherished things in one's life may come therefrom wholly separate and apart from the rights of support and maintenance. In our opinion if the person named as beneficiary stands in fact in the relation of a parent toward the insured, yielding whatsoever there is of substance or sentiment to the relationship, the fact that the person who is the recipient of the fruits of such relationship is an adult is immaterial."

Although in the Zazove case the court was giving consideration to the relationship between one adult and another, there is even greater reason for applying the same reasoning to the case at bar where the insured was a minor during most of the more than eight years he lived at the home of the person he designated as beneficiary.

The interpretation given by the Circuit Court of Appeals of this circuit in the Zazove case has been approved by district courts in other circuits. See: Baldwin v. United States, D.C.Mo., 68 F.Supp. 657, and Smith v. United States, D.C.R.I., 69 F. Supp. 387.

Judgment may go for the plaintiff.