**HORSMAN et al. v. UNITED STATES et al.**

**No. 387.**

District Court, W. D. Missouri, S. D.

July 27, 1946.

Lawrence Goldman, of Kansas City, Mo., Charles L. Chalender, of Springfield, Mo., George R. Laub, of Cresco, Iowa, and Warren M. Turner, of Springfield, Mo., for plaintiffs, defendant, and interpleader Hawley.

Breen, Breen & McCormick, of Fort Dodge, Iowa, and Haymes & Dickey, and R. Ralph Stone, all of Springfield, Mo., for other interpleaders.

REEVES, District Judge.

This is a suit for $10,000 on a policy of insurance issued under the National Service Life Insurance Act, 38 U.S.C.A. § 801 et seq. The government issued its policy to one Fred Lang. The said Lang was inducted into military service on August 10, 1940. He applied for insurance in the sum of $10,000 on February 13, 1942. In his application he gave his age nearest birthday 32. As beneficiaries he named "Mr. Lem M. Horsman, foster father, Route #2, West Plains, Missouri, Mrs. Viola Horsman, foster mother, same address as above."

It was provided in the form of application supplied by the government that the insurance applied for might be made pay-

able to "parent (including person in loco parentis)." The policy became effective February 1st, 1942, and on March 30, 1942, assured was killed in action while fighting with the armed forces in the Philippine Islands. In due course the plaintiffs, as the named beneficiaries, made claim for the amount of benefits promised but the application was rejected upon the ground that they were not in fact proper beneficiaries, as they did not stand in loco parentis. Later this suit was filed against the government and at the instance of the government the interpleaders, as brother and sisters of the assured, were brought into the case. By the answers of both the government and the interpleaders, it is stoutly denied that the plaintiffs at any time in fact did stand in loco parentis and therefore, under the limitations fixed by the National Service Life Insurance Act, they are not entitled to recover.

If the plaintiffs be denied recovery, then clearly the brother and sisters are beneficiaries under the Act and would be entitled to the promised benefits.

[1] It was admitted at the opening of the trial that the insured was born October 27, 1903, and therefore was, on February 13, 1942, 38 years old as at his nearest birthday. In view of this, the premium of $7.20 per month deducted by the government was insufficient to pay for a policy of $10,000. Under the law, the government would only be liable for such an amount as $7.20 per month would purchase at the attained age of the assured, which was 38 years instead of 32 years. Such amount was computed by the government, as it appears from the answer, at $8,888.88. Since it is admitted that the policy was issued and in force on the life of the said Fred Lang and that he was killed in battle on March 30th, 1942, while said policy was in force, the only question for decision is the proper beneficiary or beneficiaries under the National Service Life Insurance Act.

If the plaintiffs did stand in loco parentis to the assured, then they are entitled to recover. Otherwise, the benefits should be paid to the brother and sisters or representatives.

The evidence of the plaintiffs tended to show that on July 4, 1922, when assured was 18 years old, he was employed by the plaintiff, Lem M. Horsman, for labor on the farm operated by the said Horsman. He was paid regular wages until the employment terminated at the end of the summer. About Thanksgiving of the same year the assured returned to the Horsman farm home, thinly clad and without socks. He then asked for a home, said he had never had a real home, "had been whipped by his adopting parents" and acted as if he did not have a friend in the world. He was hungry. He was fed by plaintiffs and clothed by them and continued in their home, with little or no interruption, for three or four years. No wages were paid him but he was given spending money and clothing was bought for him. At first he wore the clothes of the plaintiff Horsman and did this "till he was fitted out at the store." Plaintiffs treated him as their own child. They undertook to instruct him religiously.

About the same time the plaintiffs had taken a young boy, named Paul, from a New York foundling asylum, age 5½ years, and ultimately adopted him. The assured looked after Paul and helped around the farm. He was respectful and kind toward plaintiffs. During the time, however, he did some work for the neighbors, occupying a day or two of his time. After a lapse of five or six years he went to Iowa and after a little while there sent for money to return to the Horsman home. This money was supplied. He continued to live with the Horsmans, with varying intervals of absence, until he joined the army, on August 10, 1940.

Upon the evidence, his absences from the Horsman home were always attended with an intention to return. A room was provided for him and he was always welcomed back. The evidence, both on the part of the plaintiffs, the government and the interpleaders, was to employ the language of the witnesses, "that he was of a nervous temperament," "not always bright," "always in need;" "had kind of crazy spells;" "anybody could get his money;" "not a bright man;" "usually broke;" "roved around over neighborhood;" "nev-

er had money," and the foregoing characterizations were repeated many times by the witnesses. The only difference between the testimony of the plaintiffs and that of the defendant and interpleaders was that the defense witnesses testified he spent more time away from the home of the plaintiffs than indicated by them. Moreover, some of the witnesses for the defendant and interpleaders testified that he remained with a relative who had formerly adopted him until about the year 1925. On this question, however, they were uncertain on cross-examination. Letters written to plaintiffs by the assured were offered in evidence. Such letters contained sentiments both of affection and gratitude toward the plaintiffs. As an illustration, by letter dated March 9, 1941, from an army camp, the assured said, among other things, "I'll never forget what you and Viola has done for me." Then, in reference to another policy of insurance, made payable to plaintiffs, he said, "I rather have you and Viola get the money than any one else * * * I rather have you and Viola have the money because you have taken me in, sheltered and fed me good meals." To show his gratitude he made rather extensive purchases of household and kitchen furniture and equipment. He mentioned the fact to his officers and said, "I told them what you and your wife, Mrs. Horsman, had done for me." And, again, "I never will forget what you all done for me." Again, "I told the Insurance Co. that you folks were same as my own parents." In his letters he expressed the desire to return to the Horsman home and even to resume his work there. These letters were written when he was 37 or 38 years old.

Other facts, as such may become pertinent, will be stated in the course of this memorandum opinion.

■ 1. The assumption of the relation of one person standing in loco parentis to another is, under all the authorities, a question of intention. There can be no doubt but that the assured considered the plaintiffs in that relation toward him. His letters indicated such intention and in so far as he was concerned the designation of the plaintiffs as "foster-father" and "foster-mother" would be conclusive upon that question. When he applied for his insurance he considered them as his foster-father and foster-mother and clearly from his correspondence it was his desire that the benefits promised by the government should be paid to them in the event of his death. As said in the case of Meisner v. United States, D.C., 295 F. 866, 868, "It is the policy of the courts, if possible, to effectuate the expressed wishes of a deceased soldier." This should be done unless it appears that the plaintiffs do not come within the permissible class of beneficiaries.

■ 2. It should be next ascertained whether from the evidence the plaintiffs intended to assume the relation of foster parents to the assured, or, in other words, to stand in loco parentis. In the summer of 1922 the assured worked for the plaintiffs for the first time. Regular wages were paid him. His employment was terminated and he went away. About Thanksgiving of the same year he returned, hungry and poorly clad. He begged the plaintiffs for a home. They granted his request. Thereafter no wages were paid to him. He was clothed precisely as parents would clothe a son. He was given spending money in the same way and a place in the home was left open for him at all times. The plaintiffs treated him as a member of the family. Soon thereafter, having attained his majority, he came and went in the exact way that a natural son might come and go. The plaintiffs actually assumed the obligations incident to the parental relations, without at the same time going through the formalities necessary to a legal adoption. This is precisely what is meant by in loco parentis. 32 Words & Phrases Permanent Edition, p. 415; 46 C.J. § 174, p. 1334; Miller v. United States, 8 Cir., 123 F.2d 715, loc. cit. 717.

■ 3. While upon the evidence it appears that the assured became a member of the family of plaintiffs, when he was 18 years old, yet, assuming, as contended by the defendant and interpleaders, that he did not in fact go there until the year 1925, when he was 21 years old, under the

laws of Missouri, as well as under general law, his proved inadequacy would make him a subject of this class of adoptions. "He was easily influenced;" "always broke;" "was not bright;" "had kind of crazy spells," and "anybody could get his money." In cases of such inadequacy or incapacity, an adult may properly have some one stand in loco parentis toward him.

4. The cases cited by counsel for defendant and interpleaders are inapplicable to the facts here. In the Meisner case, supra, the deceased soldier designated as his beneficiary a daughter of the persons claiming to be his foster parents. In that case it was necessary to prove that they were in fact foster parents so that the named beneficiary could qualify as standing in the relation of sister. In this case the assured not only claimed the plaintiffs as his foster parents but actually designated them as such in his application for insurance. In the case of Howard v. United States, D.C., 2 F.2d 170 loc.cit. 174, the issue was not whether the beneficiary stood in loco parentis but whether he was an actual parent by consanguinity or affinity. The court found that such relation did not exist.

In this case not only did the assured assume the relationship in his application but by an overwhelming preponderance of the evidence the plaintiffs not only intended that the relationship should exist but actually assumed the obligations of foster parents. After the assured had grown to manhood and left the home of his foster parents he asked for money to enable him to return. On his last furlough he came to the home of his alleged foster parents. Being in need of money to return to the army his claimed foster father provided him with the necessary funds. It was not unnatural for him to take a note for the repayment of the money advanced. Assured was then 37 years old. When assured left his home for the last time, he wept. This is not the conduct of one who was a stranger. Moreover, the acts of the plaintiffs were not prompted by any hope of gain. They did not know about the insurance, either that of the government or a private insurer. The assured was beyond the seas when he designated them as his beneficiaries. He was under no coercive influence nor is such contended by any of the parties.

Under all the evidence the plaintiffs are entitled to recover and judgment should be rendered accordingly. Counsel for plaintiffs will prepare a proper judgment entry wherein an allowance of 10% of the recovery will be made for counsel fees.