**BALDWIN v. UNITED STATES et al.**

**Civ. No. 373.**

District Court, W. D. Missouri, St. Joseph Division.

Nov. 21, 1946.

Miles Elliott, of St. Joseph, Mo., for plaintiff.

Ronald S. Reed, of St. Joseph, Mo., for defendants Mabel Elizabeth Whitley and Neil W. Bayne.

Charles L. Chalender, of Springfield, Mo., for defendant United States.

DUNCAN, District Judge.

This is a suit to determine to whom shall be paid the proceeds of a National Service Life Insurance policy issued pursuant to the provisions of Title 38 U.S.C.A. § 802 on March 9, 1943 by the United States of America upon the life of Jack Bayne, who met his death in Germany on March 23, 1945 while on active duty with the Armed Forces of the United States. At the time of his death he had not reached his 21st birthday.

The insured designated the defendant Mabel Elizabeth Whitley as principal beneficiary, describing her as "aunt in loco parentis," and her husband Charles Whitley as "uncle in loco parentis," contingent beneficiary.

Following insured's death, the plaintiff, his natural mother, and the defendant Mabel Elizabeth Whitley each filed claims and sought to have the proceeds of the policy paid to her. Whereupon the Veterans' Administration caused on investigation to be made, and thereafter it approved the claim of the defendant Mabel Elizabeth Whitley, and authorized the benefits to be paid to her. Thereupon the plaintiff filed this suit alleging that she was the natural mother of Jack Bayne; that as such, she was the lawful beneficiary and entitled to the benefits; that the defendant Mabel Elizabeth Whitley was not related by blood or marriage, nor did she stand in the relation of loco parentis to the said insured, and was therefore, not one of the persons authorized under the law to be named a beneficiary in such policy.

The defendant United States of America disclaims any interest in the policy and asks the court to determine to whom the benefits should be paid. It also asked that Neil W. Bayne, father of the insured, be re-

quired to intervene, which request was granted by the court.

The defendant Mabel Elizabeth Whitley claims in her answer that she stood in loco parentis to the insured, and was therefore within the class of persons eligible to be named a beneficiary under the Act, and that she is entitled to the proceeds of the policy.

In his answer, Neil W. Bayne, father of the insured, alleged that insured made his home with the defendant Mabel Elizabeth Whitley and her husband Charles Whitley for many years during his minority, and was educated and treated as a natural son by the defendant Mabel Elizabeth Whitley and her husband Charles Whitley, and that the plaintiff Gladys Baldwin and her husband Douglas Baldwin had not stood in the relation of loco parentis to the deceased for many years prior to his entrance into the Armed Forces of the United States. He disclaims any interest under the policy, and asks that the defendant Mabel Elizabeth Whitley be awarded the benefits.

Plaintiff was the only witness to testify in her own behalf. Many persons testified on behalf of the defendant Mabel Elizabeth Whitley, concerning the relationship between the parties. The sole question for determination by the court is whether or not the defendant Mabel Elizabeth Whitley stood in loco parentis to the deceased Jack Bayne. No cases have been cited to the court in which this particular question has been determined. Several authorities have been cited in which the question of loco parentis between deceased World War I veterans and persons who sought to place themselves in that status have been cited, but the factual situation in those cases is different. There the questions for judicial determination were whether or not these who had been named beneficiaries could stand in loco parentis to deceased certificate holders who had reached their majority before the alleged relationship actually began.

In the present case we are not concerned with that problem. The relationship, whatever its legal significance, began when the deceased was 13 years of age and continued until the time of his death, prior to his having reached his majority, so we are primarily concerned here with whether or not the relationship in loco parentis may exist where it is admitted there is a natural parent living in the same community and who is on friendly terms with the child.

The mother and father of the deceased were divorced in 1927. Provision was made in the divorce decree for the payment of $40 per month as support and alimony. This amount was reduced from time to time until 1933 when it finally was reduced to the sum of $15 per month. Apparently the defendant Neil W. Bayne made payments in various amounts under orders of the court until about 1936 when he ceased to make any further payments. The plaintiff and her present husband Douglas Baldwin were married in 1929.

Seemingly a close relationship between the parties began when the deceased was born; the parties were neighbors and almost from the beginning the plaintiff and the deceased's father were having marital troubles, and Mrs. Whitley took care of the child a great part of the time while its own mother, due to economic circumstances, was required to go out and work. From all the evidence the mother was a splendid woman, took an interest in her child and did her best to make and provide a home for him. This rather intimate relationship between the parties extended over all of the time involved in this proceeding, even after the deceased had gone into the Army. As a matter of fact, the parties visited back and forth in each others' homes for many years on alternate Sundays; going on picnics together and doing the usual things that families do, who enjoy a close and friendly relationship.

For many years the defendant Mabel Elizabeth Whitley has been in charge of the cafeteria at Central High School in St. Joseph; her husband is an invalid and has been able to work only occasionally. He was a painter and decorator by trade, but because of a tubercular condition, was unable to follow his trade, except at rare intervals. Therefore, Mrs. Whitley was the real breadwinner of the family.

There was a strong inference from the evidence that the deceased Jack Bayne and his stepfather did not get along. While the

testimony on the part of the parties who are directly concerned is entirely silent with regard to this matter, there is testimony from the friends of Jack Bayne to whom he had talked about the situation, indicating that the relationship between him and his stepfather was not harmonious, and we find that along about November 1937 (the evidence is somewhat conflicting on this score) Jack Bayne took up his residence with the Whitley family.

Some time prior thereto the husband of plaintiff had been on WPA and the family was having some financial difficulties. The suspicion cannot be escaped that when the alimony and maintenance payments on the part of Neil W. Bayne stopped, the stepfather was reluctant to support the child. At any rate, it was shortly after this that Jack went to live with the Whitleys. The undisputed testimony is that the Whitleys had an extra room, and that it was suggested by Mrs. Whitley to Mrs. Baldwin that Jack come and live with them, that it would help them (the Baldwins) who, as the evidence shows, were cramped in their living quarters as well as in their financial affairs generally.

Jack came to live with the Whitleys, was provided a room, and apparently all of the things that boys usually require in the way of support and maintenance were provided by the Whitleys. The neighbors in the neighborhood into which they moved thought that Jack was a member of the Whitley family, and from that time until his entrance into the Army, this relationship existed. The friendly relationship between him and his mother continued. He always referred to her as "Mother," and the evidence shows that his visits to his mother were frequent and entirely friendly, but that at all times he returned to the Whitley home where he had his clothes, and all of his possessions and belongings, and that it was only rarely that he went to his mother's home for more than a casual visit, or a meal.

Two or three years after he came to live with the Whitleys, he acquired a paper route for the delivery of the St. Joseph News-Press. In connection with that transaction, Mrs. Whitley signed the contract for him and provided a bond which was required by the publisher. During the time Jack had his paper route, he probably earned $10 or $12 a week from it, although there were times when he would require money with which to finance it. Whenever this financing was necessary, it was Mrs. Whitley who did that. All the money received from his paper route was used by him for his own wants, and no part went to the Whitleys, or to the Baldwins.

Although I am sure his own mother from time to time gave him a few articles of clothing, it plainly was Mrs. Whitley who provided his clothes, and kept them in proper condition. The Whitleys did his washing and performed all other services with respect to his living requirements while in their home.

Though the Whitleys were no relation to him, insured referred to them as "aunt" and "uncle," and upon many occasions expressed to his friends his sincere appreciation for the many things which they had done for him. After he became old enough, he drove the Whitley automobile on his dates, and at other times when it was agreeable with the family to do so. The instructions with respect to his conduct came from the Whitleys. When he desired to do something that would ordinarily require parental authority or consent, it was to the Whitleys that he applied. When he entered high school he gave the name of his father and mother as his parents, and the address of the Whitleys as his residence.

Jack was a bit headstrong upon many matters; he did not get along too well in school, although admittedly a bright boy. His teachers repeatedly discussed his problems with Mrs. Whitley. The plaintiff contends that this was only natural because Mrs. Whitley was and had been in the high school for many years. They seem to have had the impression that Mrs. Whitley was responsible for him and his conduct. This, notwithstanding the fact that Mrs. Baldwin, through the efforts of Mrs. Whitley, also worked in the high school cafeteria for a short time.

These discussions were frequent during the last year of Jack's enrollment in high school. He had then reached that age when

most boys were thinking of military duty, and apparently he was of the opinion that there was little use to continue in school when he would so soon be called into military service. Those problems were discussed between him and the Whitleys, and also between him and his mother in an effort to reach a conclusion as to what his future course should be.

Upon his final graduation, the notice was sent to his own mother by the principal of the high school, advising her that in view of the fact that Jack was in military service, she was authorized to appear and receive his diploma. This she did, and at the time of trial, the diploma was in her possession. However, it was Mrs. Whitley who paid the fees incident to his graduation, that were required to be paid by all persons who graduated from high school. Miss Varner, the principal of the high school testified that she and other teachers at the high school always looked upon Mrs. Whitley as being responsible for the boy. Mrs. Whitley made arrangements for his lunches at the high school cafeteria.

At the time of insured's induction into the Army at Fort Leavenworth, one of his close friends was immediately behind him in line, and when the officers in charge made inquiry of Jack as to who should be named the beneficiary in his policy, heard him inform them that he wanted Mrs. and Mr. Whitley, his "aunt" and "uncle" to be named. When informed that such persons were not eligible to be named as beneficiaries under the law, he had some discussion with the officers, and after a conference, the officers wrote into the policy the names of the parties and described them as in loco parentis.

Thereafter, on more than one occasion, the deceased told his friends in the Service that he had made the Whitleys his beneficiaries because of the many things they had done for him, and that he wanted them to have his insurance. He also made some comments concerning his relationship with his stepfather. However, the amicable relationship between him and his mother continued, as evidenced by the numerous letters she received from him during the time he was in the Service. The evidence does not show that he ever communicated to any of the parties the names of the beneficiaries.

During the time he was in the Service he returned on furloughs and always stayed at the Whitley home; he made requests for and received money from the Whitleys during the time he was in the Service.

Numerous letters from insured were introduced by both sides. All of the letters were very much the same. Most of his letters addressed to his mother referred to her as "Dear Mom," and they were the usual type letters that a boy might write home inquiring about the various members of the family. At times they were addressed "Dear Folks" and ended "Your Loving Son," or "Your Loving Son Jack," or "Lots of love" etc. In one such letter addressed "Dear Mom" he made inquiry as to the family and the letter concludes: "Well sweets I had better close for now. You're the best mother a guy ever had. Love Jack." In another he says: "because I think you're swell, Mother, and just exactly right." It closes with the following: "I am sorry I was late but it's better late than never. Your loving Son."

Equally as many, if not more letters were written to the Whitleys. He usually addressed the Whitleys as "Dear Folks" and most of his letters were concerned with the things at the home. One refers to a proposed sale of a car by his "Uncle Charlie." He expresses gratification that it has not been sold and says "I don't know what I would do without a car when I get home. Love Jack." In another he uses this language:

"Dear Folks:

What's this I hear about girls staying at the house now? I guess its all right as long as you keep them out of my room. I remember when we first moved into that house you gave me that room and said it was mine and I don't want any girls in there except two—you and Bev, the rest can just stay out of it. Love, Jack." (Bev referred to was his fiancee).

Still another:

"Dear Folks:

You ask in one of your letters if I had received the money you have sent and I have gotten all you have sent so far."

Still another:

"Dear Folks:

How is the old car doing? I hope you keep it as I am planning to really fix it up when I get back."

Further:

"Dear Folks:

* * * I sure was happy to hear you have the place paid for. I know that sure meant a lot to you and me too. I am going to start sending money home soon. I am buying Bev an engagement ring and I hope you approve and I think you do."

Again in a letter addressed from North Africa dated Nov. 10, 1943 he says: "I think I have received all the money you have sent so you don't have to worry about that." He again writes:

"Dear Folks:

* * * I got my package * * * The one I liked most of all was my bill-fold with yours and Uncle Charlie's picture in it. That is the only picture I have of you so I am really proud of it. * * * I will probably be sending money orders home every month or every other and you can put it in the bank for me."

Further he writes:

"Dear Folks:

* * * I haven't heard from Dad and I haven't written either * * * About sending money home. I have saved almost $30 and think I will need it handy in case I come home and I am buying that bond so as to have money after this war. * * * I wouldn't be too hasty in selling my clothes as there is always the chance of losing weight."

Again he wrote:

"Dear Folks:

* * * I got the money you sent me and it really came in handy. I only wish I had a little more. Could you by any chance send me some in about 3 or 4 days, or may be you had better wait until Sat. or Sun."

In another letter he states:

"Dear Folks:

* * * I went to town Sat. night for the first time and went to a U.S.O. dance. I went in with an older man and I was in good company all evening so you don't have to worry about me getting in trouble. I am still waiting to get that watch. I thought you would have sent it before now but I guess you are pretty busy."

A reading of his letters to them shows that it was clearly his intention to return to their home when the War was over. This, despite the fact that he continued to be on perfectly friendly terms with his mother, as expressed by the terms of affection toward her. In all of his letters to his mother—at least the ones picked out by plaintiff—there is no suggestion of any sense of responsibility on his part to his mother, or any inference of more than maternal affection on her part. He seemed to consider the Whitley home to be his home; he expected from the Whitleys, and apparently received from them the things that a boy ordinarily expects and receives from his parents. I can come to no other conclusion from the facts.

We are, therefore, confronted with the legal question—may the legal relationship in loco parentis exist under the circumstances in this case? As stated before, apparently there are no decisions directly in point. It was the intention of Congress that persons standing in loco parentis should be eligible to become beneficiaries under the Act.

The statute should be liberally construed to give full effect, as nearly as possible, to the expressed intention of the deceased soldier. Zazove v. United States, 7 Cir., 156 F.2d 24, 25; McClure v. United States, 9 Cir., 95 F.2d 744; Sovereign Camp, W.O.W. v. Cole, 124 Miss. 299, 86 So. 802; Meisner v. United States, D. C. 295 F. 866; Lem M. Horsman, et al. v. United States et al., D. C., 68 F.Supp. 522 decided by Judge Reeves.

46 C. J. Sec. 174 defines the term "in loco parentis" as: "A person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent."

The plaintiff insists that the more narrow construction which the common law places upon the definition "in loco parentis" should be applied here. Even conceding that plaintiff's contention is correct, I think the facts in this case meet the requirements of the definition.

In Dix v. Martin, 171 Mo.App. 266, 157 S.W. 133, 134, 135, the Court said: "We recognize the rule that where a person assumes towards a child not his own a parental character, holds the child out to the world as a member of his family towards whom he owes the discharge of parental duties, he stands in loco parentis to the child, and his liability is measured by that of the relationship he thus chooses to assume."

If the feelings of the deceased and the Whitleys toward each other may be used as a criterion for determining the relationship, then all of the degrees of responsibility which are essential to place them in loco parentis existed, and in arriving at this conclusion I am fully aware of the general principle of law that where there is a living parent, the presumption prevails that the relationship of a parent and child continues to exist, and cannot be loosely destroyed, nor abandoned by the parent through agreement or otherwise. Weir et al. v. Marley, 99 Mo. 484, 12 S.W. 798, 6 L.R.A. 672. But in this case we have a relationship which existed unbroken for approximately six years, with all of the apparent attendant responsibilities existing between parents and a child. The child considered it his home, he did the things with respect to that home that a normal boy would do under normal conditions; while there he expressed his appreciation of it, and when away, in the trying time of war, when he was facing the grim spectre of death, he continuously reiterated his expectation of returning to that home when the war was over.

If such facts can create the relationship of loco parentis, then it existed in this case. The facts show not only the usual affection, the interest and the anxiety that is felt by parents in the management and control of a son by the Whitleys, but likewise the financial responsibility that accompanies it was felt, expressed, and in numerous instances assumed.

The most recent published opinion on the subject is the case of Zazove v. United States et al., 7 Cir., 156 F.2d 24, 27. This case however, like all the others, involved the question of whether or not the relationship in loco parentis existed with respect to a person who was over 21. The court definitely held that it could. In that case in speaking of the relationship, Judge Minton said: "One standing in the place of a parent may give more than material things to that relationship. Not only material help may flow from such a relationship. Some of the most worth-while, precious and cherished things in one's life may come therefrom wholly separate and apart from the rights of support and maintenance. In our opinion if the person named as beneficiary stands in fact in the relation of a parent toward the insured, yielding whatsoever there is of substance or sentiment to the relationship, the fact that the person who is the recipient of the fruits of such relationship is an adult is immaterial."

Obviously in the Zazove case the Veterans' Administration had placed a narrow construction upon the term "in loco parentis." In speaking of that construction, Judge Minton further stated: "That Congress never intended such a narrow, legalistic construction of its words is evidenced by the fact that on June 3, 1946, the House of Representatives passed without a dissenting voice a liberalizing amendment to the National Life Insurance Act, which made certain that the class of beneficiaries included step parents, thereby expressing its disapproval of the narrow construction given by the Veterans' Administration to the words in loco parentis."

The most recent opinion is that of Judge Reeves of the Western District of Missouri in the case of Lem M. Horsman et al. v. United States of America et al., D. C., 68 F.Supp. 522. This case too sought to establish the relationship as to an adult. Judge Reeves, speaking of the relationship stated: "The assumption of the relation of one person standing in loco parentis to another is, under all the authorities, a question of intention. There can be no doubt but that the

assured considered the plaintiffs in that relation toward him. His letters indicated such intention and in so far as he was concerned the designation of the plaintiffs as 'foster-father' and 'foster-mother' would be conclusive upon that question. When he applied for his insurance he considered them as his foster-father and foster-mother and clearly from his correspondence it was his desire that the benefits promised by the government should be paid to them in the event of his death."

Judge Reeves further quoted from Meisner v. United States, D. C., 295 F. 866, 868, in which it was stated: "It is the policy of the courts, if possible, to effectuate the expressed wishes of a deceased soldier."

The Whitleys stood in loco parentis to insured during a period of approximately six years, despite the congenial and affectionate relationship existing between him and his mother, and apparently that relationship extended no further than that.

The defendant Mabel Elizabeth Whitley is entitled to the benefits of the insurance. Judgment will be entered accordingly. The proper orders may be submitted in accordance with this opinion.