**THOMAS v. UNITED STATES.**

No. 11229.

United States Court of Appeals
Sixth Circuit.

May 14, 1951.

Jackson C. Kramer and R. R. Kramer, Knoxville, Tenn. (Jess E. Pearman, Harriman, Tenn., Jackson C. Kramer, R. R. Kramer, Kramer, McNabb & Greenwood, Knoxville, Tenn., on the brief), for appellant.

Ferdinand Powell, Jr., Knoxville, Tenn. (Otto T. Ault, Chattanooga, Tenn., Ferdinand Powell, Jr., Knoxville, Tenn., on the brief), for appellee.

Before HICKS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Lula Hickey Thomas, the beneficiary named in a $5,000 policy of life insurance issued by the government on the life of Casper W. Hinds, a deceased soldier, brought suit to recover the amount of the policy. The district court held that the beneficiary, who was the aunt of Hinds, did not stand in loco parentis to him and, therefore, was not entitled to recover under the provisions of the National Service Life Insurance Act, 38 U.S.C.A. §§ 801 et seq., as amended. The applicable provisions of the above-mentioned statute which were in effect at the time of the issuance of the policy here involved, and also, at the time of the death of the insured, read as follows:

"The insurance shall be payable only to a widow, widower, child (including a stepchild or an illegitimate child if designated as beneficiary by the insured), parent [including person in loco parentis if designated as beneficiary by the insured], brother or sister of the insured. The insured shall have the right to designate the beneficiary or beneficiaries of the insurance, but only within the classes herein provided, and shall, subject to regulations, at all times have the right to change the beneficiary or beneficiaries of such insurance without the consent of such beneficiary or beneficiaries but only within the classes herein provided". Title 38 U.S.C.A. § 802 (g).

"The terms 'parent', 'father', and 'mother' include a father, mother, father through adoption, mother through adoption, persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year". Title 38 U.S.C.A. § 801(f).

Appellant contends that, at the time of the death of Casper W. Hinds, she stood in loco parentis to him within the intendment of the language of the Act above quoted, and the facts upon which she bases her claim are these:

Mrs. Thomas was the aunt of Casper, being a sister of his mother. As a young girl, she lived in the country near the town

of Rockwood, Tennessee, where her sister resided with her husband. She was often in her sister's home, and a most intimate family relationship existed between them. When Casper was born in 1909, Mrs. Thomas was a girl about eighteen years old, and at the time of his birth, she was the first one to dress him in his infant clothes. During his childhood and until he was twenty-one, Hinds resided with his father and mother in Rockwood. At the time of their deaths in 1931, he came to live with appellant in her home in the same village. At this time, he was twenty-two years old. There was never any agreement between them as to his coming to reside with her or as to his living expenses. He knew he was welcome and simply made his home with his aunt, her invalid husband, and her two small daughters. During that period, at different times, he worked in the local store. About three years after he came to live with appellant, he married, but the marriage lasted only about six months. He returned to make his home again with appellant, and was divorced a year or so later. In her home, he had his own room and his regular place at the table as a member of the family. He paid nothing for board or room, but on many occasions, made gifts of money and gave other presents to his aunt such as scarves, handkerchiefs, and aprons; at other times, he bought shoes, dresses, and other things for the little girls, and took them to the moving picture shows and soda fountains. They said he treated them as his sisters. His aunt washed and ironed his clothes and repaired them without the thought of any charge for her work, the same as for her husband and children. For many years, her husband was paralyzed, and for seven years, largely confined to his bed. Hinds would assist his uncle, feeding him, shaving him, and assisting him to walk out in the fresh air and sunshine. Whenever Hinds was ill—at one time, for some weeks —appellant cared for him and bought his medicines, paying for them out of her own funds, in spite of the fact that she was also obliged to work outside the home,

cooking in a cafe to help out with the family income. At such times, one of her small daughters would carry his breakfast to him, and appellant would bring different dishes from the restaurant while he was ill. During one of the years that Casper was living with his aunt in Rockwood, her son-in-law, who was working in Kingsport, a city about 150 miles away, prevailed upon her to move up to that place during the winter. She and her husband and one of her daughters agreed, and Casper went along with the rest of the family, helping in the moving, and living with them until they returned to Rockwood for the summer, when he also returned with them. When Casper was called up for military service, he was living with his aunt, and it was she who gave him the Bible that he took with him when he joined the Army. When he was in camp, he wrote her intimate letters of affection. On Mother's Day, he sent her a so-called "Mother-gram" written with the concluding lines: "You are a wonderful Mother. Stop My love for you will never Stop." He also wrote her about her husband and his grandmother who were ill:

"I can bet you have your hands full at watching after two sick persons, but just like my dear mother was I know you will do your best.

"You asked if I could get off in case of Uncle John's passing, yes I guess I could, and of course I would appreciate knowing it and coming if I could as you say you all have both treated me like a son. * * * I will tell you how. * * * You go to the Red Cross there in town tell them that I have always been more or less like one of your own children and that my insurance is made out to you * * * tell them to wire my commanding officer here and request that he grant me an emergency furlough, * * *."

In reply to her request to know what he needed, he asked her to send toilet soap and razor blades, and concluded his letter: "Write me every chance you have and I will do the same." She wrote him, telling him she had sent what he had requested,

and explained how difficult it was to write to him:

"I washed a big washing today and cut some wood after I got through and I am plenty tired. I never have time to write till at night and then I am always so tired I can't get at it.

"So may the Lord's richest blessings be with you at all times is my prayer. Keep looking up and keep smiling the darkest hour is just before day."

In a letter returned to her, appellant wrote suggesting which of his relatives Casper should write to, telling him about the little Sunday School conducted in her home, and concluding: "It is awful hard on me sometimes with Papa to take care of. * * * I just keep holding on and hoping for a better day after while. You know the Word tells us to be patient in all things for the coming of the Lord draweth nigh. Again, 'they that wait upon the Lord shall renew their strength.' So, I sure hope you are going to church and Sunday school somewhere. Guess I will have to hurry on now it's getting late and I'm awful tired." The returned letter was followed by a telegram from the Secretary of War informing appellant that her nephew, Casper W. Hinds, had been reported missing in action.

He never came back.

Mrs. Thomas said: "When the message came in that he was killed I broke down and wept just as same as I did when my own little boy died. I couldn't tell a bit of difference in the feeling and I couldn't tell any difference between him and my own children."

In the insurance policy in which appellant was named as beneficiary, her relationship was described as "(Aunt) Foster-Parent." The issue is whether, in the light of the foregoing circumstances, Mrs. Thomas stood in the place of a parent to Casper—whether this relationship was "in loco parentis" within the meaning of the statute.

In construing the language of a statute, it is the rule that the words are to be given their natural, plain, ordinary, and commonly understood meaning. The words, in loco parentis, merely translated, mean "in the place of a parent." The ordinary meaning of a person standing in loco parentis would, therefore, seem to be a person standing in the relation of, or assuming the relation of a parent to another. The offices and duties of a parent are, as Lord Cottenham said, "infinitely various." Some have no connection whatever with making provision for the child; and many of the benefits of such a relationship, under given circumstances, would be much more important than the making of such provision. Powys v. Mansfield, 3 Myl. & Cr. 359. One assuming the place of a parent may give more than material things to that relationship. Some of the most worthwhile, precious, and cherished things in one's life may come therefrom, wholly separate and apart from rights of support and maintenance, as remarked by Judge Minton (now Mr. Justice Minton) in Zazove v. United States, 7 Cir., 156 F.2d 24.

In this case, the deceased soldier was regarded in the same light as a child of Mrs. Thomas. She provided a home for him in which he had a room of his own. He had a place at the family table where he was served his meals like any other member of the family, without expense to him. His washing was done by her and his clothing repaired, all without cost. He was nursed by her through his illnesses; he confided in her as he would to his own mother; and she cared for him as for one of her own children. He knew he was welcome and that he could always rely on having a home with her. When she and her family moved to another town, he moved with them; when they returned, he returned with them. As his aunt and as the sister of his deceased mother, Mrs. Thomas assumed the relation of a parent toward him as much as could be conceived without express language to that effect, or the institution of legal proceedings. The language of the statute is to be given a liberal construction in favor of the insured and to carry out his intention. McClure v United States, 9 Cir., 95 F.2d 744; Burke v. United States, D.C.Pa., 85 F.Supp. 93; Jadin v. United States, D.C.Wis. 74 F.

Supp. 589; Smith v. United States, D.C. R.I., 69 F.Supp. 387; Baldwin v. United States, D.C.Mo., 68 F.Supp. 657; Horsman v. United States, D.C.Mo., 68 F. Supp. 522. The deceased expressly designated appellant as the recipient of his insurance, referring to her as his foster parent. If the language of the statute is to be given its ordinary meaning; if the wishes of the deceased are to be respected; and if the statute is to be liberally construed to carry out his intention, then Mrs. Thomas would be entitled to the insurance. See Meisner v. United States, D.C.Mo., 295 F. 866.

In denying recovery in this case, the district court held that the term, in loco parentis, had a common law meaning; and that such meaning must control in the construction of the statute in this case. It observed that different courts might decide the case in different ways, depending upon whether the court applied the common law view of the relation in loco parentis, as expressed in the decision of this court in Niewiadomski v. United States, 6 Cir., 159 F.2d 683, 686, or followed the so-called liberal view of the relationship adopted in Zazove v. United States, supra. In the first case, it was observed that under Howard v. United States, D.C.Ky., 2 F.2d 170, one could not stand in loco parentis to an adult; and that under the Zazove case, it was held that under a liberal construction of the statute, it made no difference whether one was an adult or a minor. The court referred to the language used in the Niewiadomski case: "The term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties." Furthermore, as included in the parental status, the court, in the Niewiadomski case, enumerated certain duties such as education and support of a minor child, and certain rights, such as the right to custody, control, discipline, services, and earnings. The fore-

going references to the meaning of the term, in loco parentis, and the enumeration of duties and rights in the Niewiadomski case, stemmed from what was said in Howard v. United States, supra, where the subject was exhaustively discussed, and where the court arrived at its conclusions that one could not stand in loco parentis to an adult, upon its consideration of the English cases discussing this general subject.

The basis of the court's conclusions in the Howard case was that a person could stand in loco parentis only when he acted the part of a lawful father in providing for a child, intending to take the father's place in this particular; and he, therefore, could not stand in loco parentis to an adult who was not physically or mentally incapacitated from providing for himself. It is to be said, however, that in the Howard case, these conclusions were plainly dicta, entirely unnecessary to decision, as pointed out by Judge Reeves in Horsman v. United States, D.C.Mo., 68 F.Supp. 522, where he observed that the issue in the Howard case was not whether the beneficiary stood in loco parentis, but whether he was an actual parent by consanguinity or affinity, and that the court had found that such a relation did not exist. See also Zazove v. United States, 7 Cir., 156 F.2d 24.

In the Niewiadomski case, a soldier had lived with his uncle from the time of the death of his parents when he was a small child. At his uncle's death, he came to live with his cousin and her husband. He was, at that time, twenty-seven years old. During the period that he lived with her, he regularly paid rent. In his application for insurance, he named her beneficiary, and described her relationship as in loco parentis. She was only four years older than he was. The court held that she did not stand in the relationship of in loco parentis to him, and, while referring to the Howard case as holding that one could not stand in loco parentis to an adult, and stating that the case might possibly turn on that point, nevertheless, placed its decision on the ground that the evidence showed that the beneficiary had never intended to

assume the relation of a parent to the insured, but had always considered him, rather, as a brother than as a child. The court referred to Zazove v. United States, 7 Cir., 156 F.2d 24, stating that the court in that case concerned itself largely with the ruling that the relationship was possible even in the case of an adult, on the theory that the words, in loco parentis, were used by Congress as descriptive words, rather than in the common law sense, with which conclusion it disagreed. It further observed that the facts in the Zazove case might have been stronger than in the case before it, and sufficient to support the ruling even in the absence of a construction that the language in question was used in a descriptive sense. In spite of the language in its opinion indicating approval of what was said in Howard v. United States, supra, the court, in the Niewiadomski case, did not hold that one could not be in loco parentis to an adult.

In view, however, of the government's argument as to the common law meaning of the term, in loco parentis, and its application to the construction of the language of the statute in this case, our determination herein calls for a re-examination of the authorities discussed in the Howard case, and a consideration of the meaning which the term in question had at common law; for, if the term did not have the generally accepted common law meaning claimed, then the statute is not to be construed as contended by the government; and unless it did have a generally accepted common law meaning, appellant is entitled to recover under a liberal construction of the statute to carry out the intention of the insured. Furthermore, a review of Howard v. United States, supra, is peculiarly appropriate for the reason that practically all of the cases on which the government relies stem from the reasoning adopted in that case, and the authorities therein referred to.

The earliest case referred to by the court in the Howard case was Ex parte Pye, 18 Ves. 140 (1811), which was concerned with the question whether an advance of a sum of money to one who was left a legacy by the donor was an ademption of the legacy. It was held that where a father gave a legacy to a child, the legacy must be understood as a portion thereof if it was not so described in the will; and if the father thereafter advanced a portion for that child, although different in amount from the legacy, yet the father will be intended to have the same purpose in each instance; and the advance is, therefore, an ademption of the legacy. Where, however, a stranger gives a legacy, it is understood as a bounty, and a subsequent advance of a portion is not an ademption, unless the testator meant to give the portion as standing in loco parentis. It was upon this state of facts that the Chancellor, Lord Eldon, said: "The question is certainly of great consequence, whether this class of cases does, or does not, require evidence, that at the time the legacy was constituted, the legatee, not standing in the relation of child to the testator, was regarded by him quasi in that relation; conceiving the purpose of putting himself in loco parentis. * * *" And further: "* * * in other words, meaning to put himself in loco parentis, in the situation of the person described as the lawful father of that child."

Another case relied upon by the court in the Howard case was Wetherby v. Dixon, 19 Ves. 407 (1815), also involving the subject of the ademption of a legacy. There the Master of the Rolls, Sir William Grant, discussing the case, observed: "This is a case therefore, not of a legal parent or a person assuming the parental character, or discharging parental duties."

The last authority discussed by the court in Howard v. United States was Powys v. Mansfield, still another case relating to ademptions of legacies. This cause was heard first before the Vice-Chancellor, Sir Lancelot Shadwell, reported in 6 Sim. 528 (1836). The facts were that Sir John Barrington, a wealthy man and a bachelor, holding in deep affection his brother, Sir Fitzwilliam Barrington, who was not so richly endowed with the goods of this world, wished to do great things for his nieces, the daughters of Sir Fitzwilliam and Lady Edith Barrington. Sir John, who was seized of large estates in the Isle of

Wight and in Essex, in order to "provide a maintenance" for his nieces, and for their "advancement in life," made provisions in his will, and afterward, by settlements upon marriage. The question was whether the uncle stood in loco parentis to his nieces, as upon that issue depended the determination whether the settlements were ademptions of the legacies. If he were in loco parentis, the settlements constituted ademptions; otherwise, not.

It appeared that "Sir Fitzwilliam, in compliance with the wishes of Sir John, resided near Sir John in the Isle of Wight, and maintained a more expensive Establishment than his income (which did not exceed 400 *l.* a-year) would allow of: that Sir John and his brother lived on the most affectionate terms with each other: that for several years Sir John gave Sir Fitzwilliam 1,000 *l.* a-year: that he took the greatest interest in his nieces, behaved to them as a Father, and always acted toward them as the kindest of parents, not showing more partiality toward one than to another; that he frequently gave them Pocket money and made them other Presents, and, occasionally, advanced Money to defray the expense of their Clothing and Education: that he allowed them to use his Horses and Carriages, and had them frequently to dine with him, and that one or the other was almost always staying in his House; that he was consulted as to the appointment of their Masters and Governesses, and as to the Marriage of such of them as were married, and that, on the plaintiff's Marriage, the terms of the Settlement were negotiated between the plaintiff and Sir John, who gave the instructions for the Settlement on the twentieth of April 1817, proposed that the 10,000 *l.* should be settled on all the children of the Marriage, but, afterwards, on the suggestion of the plaintiff, it was agreed that the 10,000 *l.* should be settled on the Younger Children only, as the Eldest Son would be entitled to a considerable Estate on his Father's side." The Vice-Chancellor found that Sir John's great object of affection was his brother, and that it was not established that he had ever intended to place himself in the situation of a parent to his nieces, in the legal sense of the term; "because the legal sense of the term is that the Party has so acted toward the Children that he has thereby imposed upon himself a moral obligation to provide for them." In his determination, the Vice-Chancellor said: "there is, I believe, no Case in which it has ever been held that a Person stood in the situation of a Parent to a Child which Child was living with, and was maintained by his Father according to his means"; and upon such grounds, mainly, it was held that Sir John did not stand in loco parentis to his nieces. However, this decision was reviewed and reversed by the Chancellor, Lord Cottenham, in Powys v. Mansfield, reported in 3 Myl. & Cr. 359 (1836). In his opinion, Lord Cottenham observed: "Lord Eldon in Ex parte Pye has given to it (the term, in loco parentis) a definition which I readily adopt, not only because it proceeds from his high authority, but because it seems to me to embrace all that is necessary to work out and carry into effect the meaning and object of the rule. Lord Eldon says it is a person 'meaning to put himself in loco parentis; in the situation of the person described as the lawful father of the child'; but this definition must, I concede, be considered as applicable to those parental offices and duties to which the subject in question has reference, namely, to the office and duty of the parent to make provision for the child. The offices and duties of a parent are infinitely various, some having no connection whatever with making provision for the child; and it would be most illogical, from the mere exercise of any of such offices or duties by one not the father, to infer an intention in such person to assume also the duty of providing for the child. The relative situation of the friend and of the father may make this unnecessary, and the other benefits most essential.

"Sir William Grant's definition is, 'A person assuming the parental character, or discharging parental duties' (19 Ves. 412) which may not seem to differ much from Lord Eldon's, but it wants that which, to my mind, constitutes the principal value of Lord Eldon's definition, namely, the re-

ferring to the intention, rather than to the act of the party. The Vice-Chancellor says, it must be a person who has so acted toward the child as that he has thereby imposed upon himself a moral obligation to provide for it; and that the designation will not hold, where the child has a father with whom it resides, and by whom it is maintained. This seems to infer that the locus parentis assumed by the stranger must have reference to the pecuniary wants of the child; and that Lord Eldon's definition is to be so understood and so far I agree with it; but I think the other circumstances required are not necessary to work out the principle of the rule, or to effectuate its object. The rule, both as applied to a father and to one in loco parentis is founded upon the presumed intention. A father is supposed to intend to do what he is in duty bound to do, namely, to provide for his child according to his means. So one who has assumed that part of the office of a father is supposed to do what he has assumed to himself the office of doing. If the assumption of the character be established, the same inferences and presumption must follow. The having so acted toward a child as to raise a moral obligation to provide for it, affords a strong inference in favor of the fact of the assumption of the character; and the child having a father with whom it resides, and by whom it is maintained, affords some inference against it; but neither are conclusive.

"If, indeed, the Vice-Chancellor's definition were to be adopted it would still have to be considered, whether in this case, Sir John Barrington had not subjected himself to a moral obligation to provide for his brother's children, and whether such children can be said to be maintained by their father. A rich unmarried uncle, taking under his protection the family of a brother, who has not the means of adequately providing for them, and furnishing, through their father, to the children, the means of their maintenance and education, may surely be said to intend to put himself, for the purpose in question, in loco parentis to the children, although they never leave their father's roof. An uncle, so taking a family under his care, will have all the feelings, intentions, and objects as to providing for the children, which would influence him if they were orphans. For the purpose in question, namely, providing for them, the existence of the father can make no difference. If, then, it appear, from an examination of the evidence, that Sir John Barrington did afford to his brother the means of maintaining, educating, and bringing up his children. according to their condition in life; and that the father had no means of his own, at all adequate to that purpose; that this assistance was regular and systematic, and not confined to casual presents, the repetition of which could not be relied upon; that he held out to his brother and his family that they were to look to him for their future provision, it will surely follow, if that were material, that Sir John Barrington had so acted toward the children as to impose upon himself a moral obligation to provide for them, and that the children were, in fact, maintained by him, and not by their father."

Before proceeding to the analysis of the foregoing English cases by the court in Howard v. United States, it may be observed that it is a familiar rule of construction of statutes that where words and phrases have a well-known common law meaning, it will be presumed that they are used in the sense in which they were understood at common law, McNally v. Hill, Warden, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238; and equitable principles and rules, as administered in the English court of chancery, in so far as applicable to our conditions, have been adopted as a part of our common law, In re Pennock's Estate, 20 Pa. 268, 59 Am.Dec. 718. In determining what the common law is, decisions of the English courts are looked to, and if rendered before the Revolution, are usually considered conclusive evidence of what it is. Cathcart v. Robinson, 5 Pet. 264, 8 L.Ed. 120. But decisions of English courts rendered since the Revolution, although entitled to respect and at times regarded as persuasive, are not authoritative, and will be disregarded should the exigency so require. Cathcart v. Robinson,

502

supra; see Illinois Bell Telephone Co. v. Slattery, 7 Cir., 102 F.2d 58.

The English cases referred to in Howard v. United States were all decided many years after the Revolution. They are, therefore, at most, persuasive with regard to what the common law is, as recognized in this country. While, then, they are not binding upon us as declaratory of the common law, they properly may be considered in this case to ascertain whether they sustain the view that one may stand in loco parentis only when performing the parental duty of providing for the child.

It was upon a consideration of these cases that the court, in Howard v. United States, supra, stated that it gathered that "the essential thing to bring about the relation of standing in loco parentis to a child is that one should intend to put himself in that position by performing the parental duty of providing for the child. It is not brought about by the performance of any other duty of the parent to his child short of this." [2 F.2d 175.] The foregoing conclusion does not seem to follow. The principle to be drawn from the authorities would, rather, appear to be that a person standing in loco parentis to another is one who has put himself in the situation of a parent by assuming obligations incident to such relation; and that when a person assumes such obligations, it is a question whether it be done with the intention of putting himself in loco parentis. It is true that in the cases reviewed by the court in the Howard case, the principal obligation assumed by the person, found to stand in loco parentis, was the obligation of making provision for the child. But this was the only obligation there relevant and vital to decision. In those cases, a person had left a legacy to the child by will, and subsequent to the execution of his will, had made a gift to the child. If the person had placed himself under the obligation to make provision for the child in the same way that a parent would be under such obligation—in loco parentis—then the legacy would be considered adeemed by the gift, as would be the situation in the case of the real parent. Having acted toward a child as to raise a moral obligation to provide for it, raises a strong inference that the person had assumed the character of a parent; but it is not conclusive. He must have intended to assume that office. But the duty to make provision for the child is not the only parental duty. The other offices and duties of a parent are to be considered, and a person may also assume those parental duties. Lord Eldon said that a person in loco parentis is a person *meaning* to put himself in that situation; and Lord Cottenham added that this definition must be considered as applicable to those parental offices and duties *"to which the subject in question has reference,* namely, to the office and duty of the parent to make provision for the child"—because that was the subject in question before the court—the duty to make provision. But, as Lord Cottenham further observed, "The offices and duties of a parent are infinitely various, some having no connection whatever with making provision for the child." Then, having regard to the question before him, as to whether an intention to assume the duty of providing for the child could be inferred from the assumption of other parental duties, he declared, "it would be most illogical, from the mere exercise of any of such offices or duties by one not the father, to infer an intention in such person to assume also the duty of providing for the child. The relative situation of the friend and of the father may make this unnecessary, *and the other benefits most essential."* (Emphasis supplied.) Speaking of the duty of making provision for a child, which was the controlling consideration in the particular case under discussion, the Chancellor observed that a father is supposed to intend to do what he is in duty bound to do, namely, to provide for his child according to his means. "So one who has assumed *that part* of the office of a father is supposed to do what he has assumed to himself the office of doing. If the assumption of the character be established, the same inferences and presumption must follow." Certainly, the Chancellor is not here saying that one can not be in loco parentis to the child unless he intends to put himself in that position by performing

the parental duty of providing for the child. What is plainly said is that, with reference to the specific subject matter then before the court—whether a gift had adeemed a legacy—the determination of such issue depended upon whether the donor had assumed the particular parental duty to provide for the child, with the intention of placing himself in loco parentis; that there are infinitely various offices and duties of a parent which have no connection with making provision for a child; that the assumption and exercise by a person of such offices and duties do not, in themselves, raise an inference that he intended also to assume the additional duty of providing for the child; that the relative situation of the person assuming such parental duties and of the real father may make the office of providing for the child unnecessary, and the benefits flowing from the assumption of the other parental offices and duties most essential.

One may easily suppose the case of a child with an estate of his own, or dependent for support upon a trust fund, either without parents, or with parents unable to provide for him. If a person, a relative or friend to whom the child is confided, take him into his own home, care for him, watch over his health, education, and development, physical, mental, moral, and spiritual; devote himself by precept and example to the formation of desirable qualities of character; expend his own physical and intellectual energy through the years for the welfare and benefit of the child; and assume to do all of these things in the way of a parent to a child, it would seem that such a person would, in law, be considered in loco parentis—and there is nothing in the English cases to the contrary. For these cases do not hold—expressly or implicitly—that one can place himself in loco parentis to another only when he assumes the parental duty of support.

From the foregoing cases, the conclusion to be drawn appears to be that while a person may, if he so intend, put himself in loco parentis when he assumes the office and duty of a father to make provision for a child, that is not necessarily the only way in which he may put himself in loco parentis. While, in a sense, implicit, it seems

suggested that he may do so when he assumes the other parental duties and offices, sometimes more essential than merely making a provision which, because of the situation of the parties, may be relatively unimportant.

In Howard v. United States, the court came to the conclusion that a person could not stand in loco parentis to an adult because there was no duty on the part of a parent to provide for an adult; and that, therefore, a person could not be obligated to carry out such a duty—except where the adult was mentally and physically incapacitated from providing for himself. If Powys v. Mansfield is to·be accepted as authority, as was done by the court in the Howard case, it is to be doubted that the Chancellor would have considered it impossible for Sir John Barrington to place himself in loco parentis to one of his nieces in providing a maintenance for her "according to her condition in life," solely because she was past twenty-one years of age. For the relationship in that case in no way was held to result from any obligation which he assumed to support minor children, but, rather, from his holding out to the family of his brother that they were to look to him for their future provision, and his acting toward them so as to impose upon himself a moral obligation to provide for them. We have, however, determined that it is not necessary to assume the duty of providing for another in order to stand in loco parentis; and it is to be remarked that in none of the English cases or in any other cases cited, or which have come to our attention, which were adjudicated prior to the Howard case, it is held that one can not stand in loco parentis to an adult. None of these cases mention the minority of a child as a requisite to the relationship. Likewise, in none of those cases is it indicated that any generally accepted common law meaning of the term, in loco parentis, depends upon this consideration. On this point, we are in agreement with what was said by the court in Meisner v. United States, D.C.Mo., 295 F. 866, 868, in a case involving government insurance, similar to the one before us. In its opinion, the court quoted the definition from 29 Cyc. 1670: "A person standing in loco

parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption. The assumption of the relation is a question of intention." In addition, the court referred to Black's Law Dictionary, where the following definition is given: "In the place of a parent; instead of a parent; charged, fictitiously, with a parent's rights, duties and responsibilities." The court then said: "It is the policy of the courts, if possible, to effectuate the expressed wishes of a deceased soldier. * * * If an adult is a legal subject of adoption, which formally establishes the relationship of parent and child, and if one, who assumes the obligations incident to the parental relation and takes the place of a parent without going through the formalities necessary to a legal adoption, stands in loco parentis to another, why should age condition the nature of the relationship? No sound reason appears why a person may not assume a parental relation toward an adult as well as toward a minor. The responsibilities and obligations may be fewer, but substantial ones remain. * * * It is true that reported cases deal uniformly with minors, because such are the ones toward whom this relationship is generally assumed, but that fact cannot alter the principle involved. In the absence of any prohibition in the law, either express or implied, that relationship, in the face of the obvious purpose of Congress, cannot reasonably be limited to minors." The liberal construction to be accorded the statute is emphasized in the recent decision of the Supreme Court in Woodward v. United States, 341 U.S. 112, 71 S.Ct. 605, where it was held that a brother by adoption of a deceased member of the Women's Army Corps, described in the government insurance policy as her brother, was a permissible beneficiary under the Act.

At this point, a concluding observation with respect to the bearing of the English cases upon the Howard case, and, therefore, upon the instant case, seems appropriate. Providing for a child, in the English cases, was concerned with making provision by way of large settlements upon marriage to enable the child to live in opulence, "according to her condition in life." In those cases, the uncle, standing in loco parentis, made this provision; but making such provision had nothing to do with merely supporting the child by way of furnishing the food, clothing, and shelter necessary to her existence. The actual father, although of small means, was able to do at least this much, and, since his daughters lived with him, no doubt used his own income, as far as it went for such purposes. In the Howard case, the provision for the child, therein discussed, was concerned with a father's duty to support a child and his being entitled to receive the child's wages. This is bedrock— the duty to furnish food, clothing, and shelter for a child—little more. The fact that a rich uncle, intending to stand in loco parentis to his nieces, was held to be morally bound in equity to provide marriage settlements or donate portions because he had led them to rely on him for such things and thus stood in loco parentis to them seems no authority for holding that one can not stand in loco parentis to a child unless he assumes the paternal duty of furnishing food, clothing, and shelter necessary to existence. In the English cases, the relationship, in loco parentis, did not depend upon supporting the child by providing the necessities of life, but in providing the luxuries.

As to whether there ever was a generally accepted common law meaning attached to the term, in loco parentis, it is somewhat illuminating to note that when the subject came before the Vice-Chancellor in Powys v. Mansfield, supra, the last of the English authorities above discussed, he stated that he had looked through all the cases he could find and there was no instance holding that a person could stand in loco parentis to a child living with its father, who was maintained by the father according to his means; and he, accordingly, held that a person could not stand in the situation of a parent to a child under such circumstances. But this view and holding was held to be wrong, and in reversing the decision, the Chancellor observed that the case raised questions as to which the rules and principles of the court of chancery

were not easily to be laid down or defined "and as to which the authorities are, unfortunately, not very consistent." With regard to the Vice-Chancellor's assumption that, in that case, Sir John had not placed himself in loco parentis, the Chancellor said: "The first point, therefore to be considered is, whether that be correctly so assumed; and, no doubt the authorities leave, in some obscurity, the question of what is to be considered by the expression, universally adopted, of one in loco parentis." In view of the issue before us in the instant case as to the generally accepted common law meaning of the words, in loco parentis, it is notable that a number of distinguished counsel contended before the Vice-Chancellor that the evidence in that case showed that Sir John Barrington had stood in loco parentis to his brother, Sir Fitzwilliam, who had been married for twenty-six years, rather than to his nieces; and apparently this argument was not considered at all unreasonable.

There seems to have been considerable uncertainty about the term even in these ademption cases. They do not indicate that there was any generally accepted common law meaning of the term. Certainly, they could not be said to be clear and unequivocal about such a meaning, which is the necessary requirement if they are to be accepted as evidence of what the common law meaning is. Ex parte Beville, 58 Fla. 170, 50 S. 685, 27 L.R.A.,N.S., 273.

 From the above circumstances, all relating to English chancery cases, concerning ademptions of legacies, in which the term, in loco parentis, was used in connection with ascertaining whether there had been such a moral obligation, as is known to the court of equity, on the part of one person to provide for another, we are constrained to conclude that nowhere was expressed a generally accepted common law meaning of the term, in loco parentis; and upon an examination of the cases, we are further constrained to conclude that there never was any generally accepted common law meaning of the term, in loco parentis.

It is also especially remarkable and significant that although most of the cases decided since Howard v. United States refer to that case as authority for the "generally accepted common law meaning" of the term, in loco parentis, nowhere in the opinion of that case is any common law meaning of the term mentioned, nor is it stated that there is such a common law meaning.

Since, then, it is our view that there is no generally accepted common law meaning of the phrase, in loco parentis, the natural and ordinary meaning, as heretofore indicated, is to be given the term, and the statute is to be liberally construed to carry out the intention of the insured. As previously demonstrated, the evidence discloses that Mrs. Thomas had assumed toward her nephew the relation of parent, as far as would seem possible without express language to that effect, or the institution of legal proceedings, or a definite agreement between them, none of which is necessary to create the relationship. She, therefore, stood in loco parentis to him at the time of his death, and is entitled to the insurance in question, as provided by the policy.

In accordance with the foregoing, the judgment of the district court is reversed and the case remanded for entry of a judgment in favor of appellant.