OPINION
{¶ 1} Defendant-appellant, David Funk ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas, entered upon a jury verdict finding appellant guilty of two counts of sexual battery, both felonies of the third degree.
 {¶ 2} The following facts are taken from the indictment, bill of particulars and the testimony adduced at trial. In 1999, when the first of the events subject of this case took place, the victim, to whom we will refer as "L.E." in order to maintain her anonymity, was 15 years old and lived in Burlington, Kentucky with her mother and sisters.
 {¶ 3} L.E.'s parents had separated in 1998 and finalized their divorce in March 1999. L.E.'s father, who had joint custody of her and her sisters, lived in Florence, Kentucky. During the course of her parents' breakup, it was revealed that L.E.'s father had been having an affair. During the period of L.E.'s parents' separation, L.E.'s mother, Annita ("Annita"), became involved with a close family friend named T.R. Putterbaugh ("Putterbaugh"), who was also in the midst of a divorce. In 1999, Putterbaugh moved in with Annita and her daughters. Shortly thereafter, L.E. learned that her mother and Putterbaugh were expecting a child together.
 {¶ 4} L.E. first met appellant when she was 14 years old, at a 1998 Christmas party hosted by Putterbaugh's mother. Appellant's wife, Jodi ("Jodi"), is Putterbaugh's sister. L.E. testified that when she first met appellant her relationship with him was "minimal" and consisted in appellant introducing himself. She stated that the two "talked very little, `cause my sisters and I were very quiet. And we just kind of sat on the couch, and this was all very new, getting to know a new family and try to incorporate that into our life." (Tr., 32.) She also saw appellant at a birthday party at the Columbus home of Putterbaugh's mother and stepfather ("Patty" and "Dick"), which occurred in May 1999.
 {¶ 5} The next time that L.E. saw appellant was mid-July of 1999, when L.E. attended another birthday party at Patty and Dick's home. At the time of this party, L.E.'s "home life was an absolute wreck." (Tr., 33.) She felt she could not confide in her mother and father because "they were caught up in their divorce," she could not go to Putterbaugh because he was "caught up with [her] mother," and she could not go to her grandparents because they were not aware of her mother's pregnancy. L.E. testified that all of the foregoing events made her feel "all alone in the world like I'd been abandoned. And nobody had time to stop and actually consider me in the whole situation. It was absolutely horrible." (Tr., 34.) Furthermore, L.E. testified, the fact that her mother was pregnant and unmarried "shattered" her because it "was against everything [she'd] ever been taught." (Id.)
 {¶ 6} L.E. interacted with appellant and his wife during the party. This "was the first time we really got to talk and got to know each other. And they both invited me to come spend some time at their house * * *. And my parents felt that it would be good for me to spend some time ____." (Tr., 35.) L.E. agreed to the visit and arrived in Columbus the following Thursday, July 29, 1999. Her sisters, but not L.E., had visited the couple for several days earlier that week.
 {¶ 7} Jodi picked L.E. up from the airport and the two spent the remainder of the day at appellant's home with six-month-old Cameron, who is Jodi and appellant's son, and with three-year-old Dillon, Jodi's child from a previous marriage. Appellant returned home from work that evening. After dinner and after the children were in bed, Jodi went to bed at approximately 9 or 10 o'clock. Appellant and L.E. sat up watching television for approximately one and one-half hours, and then the two went to bed. L.E. slept in Dillon's bedroom. When L.E. woke up the next morning, appellant had already left for work, and L.E. again spent the day with Jodi and the children. When appellant returned from work that evening, the whole family and L.E. visited appellant's parents.
 {¶ 8} At some point during the evening, Jodi and the older child left appellant's parents' house. During the time when Jodi was gone, appellant took L.E. out to his parents' garage to show her his father's vintage car. When they got to the garage, appellant opened one of the car's doors and said, "[a]nd this is the makeout seat, but you're probably too young for that." (Tr., 40.) After appellant showed L.E. the car, the group said goodbye to appellant's parents and returned to appellant's home.
 {¶ 9} Jodi went to bed at approximately 8 or 9 o'clock and appellant and L.E. again sat up together watching television. The two were seated on opposite ends of the same couch, with appellant "kind of laying down." (Tr., 41.) L.E. testified:
And it was kind of teasing and playful and, like, he would get up; and I would take his seat. And then he would make me get up and move. And at one point when I was sitting on the end of the couch and he was laying down with his feet stretched out, like his feet touched my thigh. And we talked a lot that night.
(Id.)
 {¶ 10} They talked about "things on TV and maybe touched a little bit on the family situation at that point. Not too many intimate details." (Tr., 42.) According to L.E., "[t]hat was pretty much the extent of that night. We went to bed shortly after that," which was at Midnight or 1:00 a.m. (Tr., 43.) L.E. does not recall what she did the following day, but testified that she remembered "exactly what happened after Jodi went to bed" that night. (Id.) She testified:
Well, we were watching TV again; and he made the comment that it was difficult to talk and watch TV at the same time with the way that the room was set up because both of us were having to look in the direction of the TV, and I couldn't turn around and look at him. And at one point he scooted over on the couch, and he kind of motioned for me to lay next to him on the couch. And I was like, "No, I don't think we should do that."
And so, I was back in the same position that we had been in the previous night with him laying with his knees up, and I was sitting at the other end of the couch. And he stretched his feet out again and put it on my thigh.
And he was like, "Oh, is that you?"
And I said, "No," even though that I knew that it was. I said," It must be a pillow," because at that point I was beginning to have a bit of a crush on him, I guess you could say. And I liked the attention that he gave me just because no one else in my life at that time had really taken notice in me at all and just to have that — especially male attention, because my father wasn't there for me.
* * *
* * * And then at one point his feet were on my leg, and they kind of creeped up to my butt. And I looked at him and said, "That's me."
He said, "Oh, I just wanted to see if you would smack me."
And I just kind of laughed and played it off.
(Tr., 43-46.)
 {¶ 11} Later that evening a thunderstorm began. Appellant suggested that the two go outside and play in the rain. At first, L.E. refused because it was too cold, but later agreed. As appellant opened the door, he said, "`We can have a wet T-shirt contest. It'll be fun.' And he said, `You would win.'" (Tr., 47.) The two proceeded outside and walked in the rain (which had "pretty much died down" by the time they finally went outside) up and down a small road or lane that runs behind appellant's house.
 {¶ 12} The area was dark and wooded and is bordered by a creek. The two talked about L.E.'s family situation and how L.E. felt about her parents' divorce. Then, appellant asked L.E. what she would want if she could have anything in the whole world. At first she was unable to think of anything, but then said she wished she were taller. Appellant said, "Why, you have nothing to worry about. You're the perfect height for a lady." (Tr., 48.) Then, he repeated his question to her.
 {¶ 13} This prompted L.E. to tell appellant about another recent disappointment. She worked on a dairy farm and helped raise dairy goats. She had worked hard, saved $1,000, and purchased her own champion goat, but after she brought the goat home, it died. The conversation continued:
We talked about my situation at school and how I always felt very insecure around people. I didn't have a lot of self-esteem. I felt people thought, when I talked, I was stupid. And [appellant] went to great lengths to assure me that I wasn't stupid, that I was wonderful; and that if anybody even for a second thought that I was stupid, that they were the stupid ones to miss how great and wonderful I was. And just really made me feel special and boosted my confidence a lot at that point.
We continued to walk, and he broached the subject that I didn't like him. And that was very much untrue, and I tried to reassure him that I did like him. And he said that every time he walked into the room with Jodi and I, I would just stop talking and shut down. And I tried to reassure him that that wasn't true. And if anything, maybe I did stop talking just because I was becoming infatuated with him. In my 15-year-old mind, an older man is giving me attention, and no one else in the world is. I think maybe that wasn't so abnormal to feel that way, and — but I did voice that to him at that point.
But he continued to probe at me, persistently said I didn't like him, and I had to prove it. He said, "Well, what do you think about it?"
And I said, "I think you're great. You're very intelligent, and you're funny, and I think you've done a lot for Jodi and Dillon and now Cameron, and I think you're really an asset to their lives, and I think you're great.
* * *
And we continued to walk. And I just kind of felt like he was probing me to say something. He kept asking me questions, "If you could have anything in the whole world, what would you want?"
Still continued to say that he felt like I didn't like him. And eventually he got it out of me, I said, "I guess, if anything, I'm afraid of liking you too much."
* * *
He said, "What, do you like me in a sexual way or something?"
I said, "No, it's not like that. I just — I really think a lot of you."
And he said, "[L.], you've just made my whole year. I can't tell you how great that makes me feel, because you're a phenomenal girl. And the moment that I first laid eyes on you at Patty's house," which is my step-grandmother, [Putterbaugh's] mother, "I just thought, wow, what a damn good looking girl."
And I was just kind of blown away. I was like really, "You think that about me? You think I'm phenomenal?
And he said, "Yes, I do." He said, "I can't tell you how many nights I've lied awake just thinking about you at 4:00 o'clock in the morning." And he said, "You just — you just made my whole year."
And at some point we stopped walking, and he gave me a really big hug.
(Tr., 49-51.)
 {¶ 14} When appellant hugged her, L.E. told him about how her sisters had been teasing her because she talked a lot about appellant when she would speak to them on the phone during her visit. Her sisters had teased her, saying, "[L.E.] likes David, just because he had given me attention and noticed me at the birthday party the previous week and joked around with me." (Tr., 52.) She told appellant that it had "kind of got to be a joke in the family that [L.E.] likes David." L.E. testified that appellant expressed concern about this, saying, "What did you — what — what was said? Why would they think that?" L.E. replied, "Because I guess I talked about you a lot, and that's why." (Id.)
 {¶ 15} The two continued their walk and at some point appellant told L.E. that he wanted to kiss her. She said, "We can't do that. It's just can't — we can't do that to Jodi. It's not right." (Id.) Appellant responded, "Yeah, you're probably right." (Id.) They returned to the house and resumed watching a movie that they had been watching earlier. As the time approached 4:00 a.m., appellant told L.E. that "it was a really good thing he had underwear on," whereupon she realized that he had an erection. She continued testifying as follows:
And being 15 years old and very naïve, I really didn't have any idea how to handle that situation. So, I mean, I didn't — I felt special because he noticed me. And we talked a little bit more.
And then finally he motioned me over to give me a very big hug and kind of pressed himself against me, so that I could feel it between my legs. And then he said it's time for me to go to bed. So I did. And I got in bed.
And he came in the room, and he leaned over me. And he said, "[L.], you are an incredible girl and don't you ever let anyone tell you differently. You have no idea how much I want to kiss you right now."
And I just said, "We can't."
And he walked off and went to bed.
But as I lay there, I remember feeling validated because nobody in my life was telling me that. And that's all I just needed to hear. I needed someone to stand up for me and notice me.
(Tr., 53-54.)
 {¶ 16} The next day was Sunday. The whole family spent the day at a car show with Jodi's parents in downtown Columbus. Throughout that day, appellant "kind of blew [L.E.] off." She testified, "I remember feeling like maybe I had said the wrong thing, done the wrong thing, made him mad. And I felt guilty because he was blowing me off." (Tr., 54.) The next day, Monday, appellant again "blew [L.E.] off." She told the jury, "I just remember being very confused because he told me those things, and then he was ignoring me." (Tr., 55.)
 {¶ 17} The next day, appellant went to work while L.E. spent the day with Jodi. Appellant worked late and did not dine with the family. Jodi went to bed at 8:30 p.m., leaving appellant and L.E. alone again. Their conversation turned to their walk that occurred late on Saturday night, and appellant asked L.E. if she was okay, to which she replied that she was fine. She continued, "And he just said that he really wanted to kiss me and just persistently asked. And I finally said that it would be okay." (Tr. 55-56.) The two were sitting across from each other at the kitchen table.
 {¶ 18} Appellant stood up, walked around the table, gave L.E. a peck on the lips, and returned to his seat. He told L.E. that he wanted to kiss her again. He stood up and again quickly kissed her on the lips. She stated that the kiss was "nothing more than a peck, really; but being 15 years old, I thought it was great." (Tr., 57.) She continued:
And then he said that he just really wanted to touch me. And I was like, "I don't know about that."
And he was like, "It's okay. I won't hurt you. You know, you can trust me." And he's like, "Maybe if I just kind of walked by and just touched you and then went in another room, how would that be? Would that be okay if I just kind of did it in passing?"
And I'm like, "Well, maybe that would be okay."
He was like, "Close your eyes and lean back." And that's what I did. And he walked by, and he lifted up my shirt and just ran his hand across my stomach and then back across the other way. And he left the room.
(Id.)
 {¶ 19} L.E. testified that she was not wearing a bra at the time. Appellant returned to the room and asked L.E. whether she liked what he had just done. After she replied in the affirmative, he asked her if she wanted more, to which she nodded her head. Appellant then lifted up her shirt all the way, exposing her breasts and putting his hands on them. He sucked on her left breast, then put her shirt down again and left the room.
 {¶ 20} A few minutes later, appellant returned and asked L.E. if she liked it. She said that she did, whereupon appellant told her to lean back and close her eyes and "point to where he wanted me to touch him next, at which point I did. I leaned back, and I put my hand on my breast and also between my legs. My body betrayed me at that point." (Tr., 59.) When appellee inquired what L.E. meant by stating that her "body betrayed [her]," she explained:
Because I knew in my heart that this was wrong and I couldn't do this to my family, to Jodi. That it was against every moral that I had ever had in my entire life. I always believed that you wait until marriage, and you save yourself for that; and here I was compromising everything, manipulated into thinking that it was okay.
So I leaned back; and he stood up. And he waited a long time to come over.
And I didn't know what he was doing; so, I opened my eyes. And I saw that he was unzipping his pants. I said," What are you doing?"
And he was like, "Well, you know, it's really difficult to walk when you have an erection."
And I was like, "Oh."
So, he's like, "Just close your eyes and lean back."
(Id.)
 {¶ 21} L.E. testified that appellant lifted up her shirt, touched her breasts with his hands and mouth, and then put his hands between her legs and felt her genitals through her shorts. Appellant then motioned L.E. to stand by the refrigerator, and she complied. Appellant put his hands underneath her shorts and underwear and digitally penetrated her. The two sat down, talked briefly, and then appellant encouraged L.E. to stand up again, whereupon he digitally penetrated her again. Appellant asked L.E. whether she wanted to see his erection, and she said no. After that, "abruptly he just pretty much said, `Okay. Now you have to go to bed.'" (Tr., 62.)
 {¶ 22} L.E. went to bed in Dillon's room. Appellant turned the light on in the hallway and stopped to check the thermostat. Wearing only boxer shorts, appellant turned around toward L.E., motioned toward his erection, and said, "Look what you do to me." (Id.) Then he went to bed.
 {¶ 23} The next morning, which was Wednesday, L.E. was in the kitchen pouring herself a glass of juice, when appellant walked in wearing only his boxer shorts. He put his hand in front of his genitals and said, "Look what you do to me." Then he took his hand away from in front of his genitals; L.E. could see that appellant obviously had an erection. That day, Jodi, L.E. and the children drove to Lake Saint Mary in Thawana, Ohio. It had been planned that they would all stay for several days with Jodi's parents in a trailer that her parents kept at the lake. Appellant had to work on Wednesday, but was to join the group the following day.
 {¶ 24} L.E. was to share a bed with Dillon. After appellant arrived at the lake, he joked to L.E. that there would be some problems if Dillon "goes like this," whereupon appellant put his hand on her right breast. Once, while the two were in Jodi's father's boat, appellant motioned to L.E. that he wanted her to expose her breast to him, but she declined. The next morning, Jodi and her mother drove L.E. back to her home in Kentucky.
 {¶ 25} L.E. testified that she told no one about what happened on that trip because:
* * * part of me, my 15-year-old mind and my body, liked the things that were happening to me; and I didn't want them to stop. I enjoyed the attention from him. And I didn't want to tell anybody because that would end up in a big blow up, and it would stop.
And I knew that I was doing wrong against Jodi, and I felt responsible for it at that point. I felt like I was — it was a consensual thing. I was just as much to blame.
(Tr., 78.)
 {¶ 26} The next time that L.E. saw appellant was on Friday, September 24, 1999, when she again traveled to appellant and Jodi's residence, and stayed there through Sunday, September 26th. L.E. was scheduled to fly on standby on the airline at which her mother worked. However, she was unable to get a seat on the plane. According to L.E., she "begged" her mother to let her go anyway, and called Jodi to try to work out a way to get to Columbus. Ultimately, appellant and Jodi met L.E., Annita and Putterbaugh at the halfway point between their two homes.
 {¶ 27} After L.E. transferred to appellant's car, Jodi needed to use the restroom. While she was gone, appellant told L.E. that his day at work had been long and rough, and that "he thought it was from all the anticipation of tonight and the weekend that we would spend together." (Tr., 81.) Appellant reached back and rubbed L.E.'s leg. During another stop, when L.E. and appellant were again alone in the car, appellant told L.E. that "[h]e had it in his mind he was going to be a good boy this time, but I just showed up in the dress I was wearing and looked so good that he didn't think it was going to be possible." (Tr., 82.)
 {¶ 28} When the group arrived in Columbus, Jodi went to bed, L.E. changed into pajamas, and appellant and L.E. stayed up watching television. While the two were in the kitchen, appellant lifted L.E.'s shirt again, and motioned for her to pull aside her shorts and underwear. She complied, whereupon he exposed his penis to L.E. Appellant then digitally penetrated L.E.. L.E. then told appellant that she was not comfortable "going all the way" and that she did not want to "have actual sex with [him]." (Tr., 86.)
 {¶ 29} Appellant responded that he would never do that, and he would never do anything to hurt L.E. "He said, `I have that much respect, I would never do that to hurt you. * * * We're just playing around, and you know that.'" (Id.) When asked how that statement made her feel, L.E. testified:
I was so confused, because in my mind, if you are going to do things like that with people, then you love them. I was very naïve at that point, and I was so trusting. And I felt like maybe I was falling in love with him, and I just kind of — was just so confused. * * *
But I hung onto the hope that maybe if I continued what had happened, that he would fall in love with me, that something more would come of it.
(Id.)
 {¶ 30} After this, while L.E. was seated in a chair at the kitchen table, appellant pulled out his genitals and asked L.E. to touch them. When she hesitated, he rubbed his penis against her cheeks. Then he put his penis in her mouth. Then, appellant said, "you said you didn't want to go all the way. Well, how about we go as far as we possibly can without going all the way, without actually having sex." (Tr., 91.) L.E. said okay, so appellant instructed her to lean up against the kitchen counter and bend over. Then, he rubbed his penis against her vagina; he digitally penetrated her; and knelt down and performed oral sex on her. Then, he had her sit back down in the chair, and thrust his penis into her mouth three or four times. After this, the two repeated the same series of acts against the kitchen counter in which they had previously engaged.
 {¶ 31} The next day, while Jodi was out of the house picking up pizza for dinner, appellant asked L.E. to go with him into Dillon's room, so the two could talk. He claimed he was afraid that Jodi had a tape recorder in the house and said that they should talk in Dillon's room, "where we know that we can be safe." (Tr., 96.) Appellant told L.E. that they should both go to bed early that night because Jodi was getting jealous; however, he proceeded to lift L.E.'s legs over her head and grind his groin area against her. He then pulled down her pants and digitally penetrated her. He then instructed her to sit up, and he put his penis in her mouth. Then he told her Jodi would be home soon and she should get dressed quickly. That night, they both went to bed early. The next morning, Jodi drove L.E. to meet L.E.'s mother at the halfway point between their two houses.
 {¶ 32} The next time L.E. saw appellant was on October 1, 1999, when she and her sisters, along with Annita and Putterbaugh, drove to a weekend-long "landing party" attended by Putterbaugh's extended family. L.E. did not testify as to any sexual activity occurring during that weekend. The next time that L.E. saw appellant was on Thursday, November 25, 1999, when he and Jodi and other members of Putterbaugh's family arrived at L.E.'s house to celebrate Thanksgiving. Appellant, Jodi and their children were to sleep in L.E.'s basement. After dinner, appellant was in the basement tending to Cameron, and he called up and asked L.E. to bring him a bottle to feed to the baby. She did so, and while the baby was eating, the two kissed and appellant touched L.E.'s breast; then he ran his hand up her leg and felt between her legs.
 {¶ 33} The next day, the whole family visited the home of L.E.'s maternal grandmother. Later, L.E., Cameron and Dillon accompanied appellant when he took his car into town to put air in the tires. During that outing, appellant told L.E. that "this just wasn't going to work and that we had to just call it all off and block it off. Block it out of our minds and just pretty much pretend like it never happened, because it was getting too dangerous, because people were starting to have suspicions." (Tr., 103-104.)
 {¶ 34} Later that evening, Jodi suggested that they all sit down with a calendar and choose a time for L.E. and her sisters to go to Columbus to visit Jodi and appellant. At this point, L.E. "had no desire to go there just because he said he didn't want to have anything to do with me anymore." (Tr., 106.) Appellant attended the January 22, 2000 wedding of L.E.'s mother and Putterbaugh, but L.E. barely spoke to him.
 {¶ 35} Ultimately, L.E. did return to appellant's house on July 12, 2000, and stayed through July 18, 2000. For the first few days of the visit, appellant ignored L.E., retiring early to his bedroom to watch television instead of staying up with her. Then, on Saturday, appellant and L.E. were alone with the children while Jodi was out shopping for several hours. While L.E. was still wearing only a towel after showering, appellant opened the door of the bedroom and stood there watching L.E. applying lotion to her body. He told L.E. to crawl into the bed and get on her hands and knees. He rubbed his penis against her vagina, and then had her kiss his penis. Appellant then put his penis away and L.E. got dressed.
 {¶ 36} A few minutes later, L.E. entered appellant's bedroom in order to use Jodi's hair dryer. As she was finishing drying her hair, appellant entered the room and, after talking with L.E. for a few minutes, placed his penis in her hand. She pulled down her pants and appellant rubbed his penis against her vagina. Thereafter, L.E. performed fellatio on appellant, and then appellant digitally penetrated L.E.
 {¶ 37} The two then joined the children out in the living room in front of the television. While appellant sat with his children, he told L.E. to go into the hallway, where she could not be seen from the children's vantage point, and to show appellant her buttocks and touch her vagina. She complied, and then they switched places and appellant "performed" in a like manner for L.E. After L.E. gave appellant one final "performance" he took her into the kitchen, had her get down on her knees, and placed his penis in her mouth.
 {¶ 38} L.E. testified that she had called her mother and asked to extend her stay at Jodi and appellant's house. Her mother agreed, but insisted that she come home on Tuesday, July 18th. On that day, Cameron developed a respiratory problem and had to be taken to the hospital. When L.E. telephoned her mother to relay the news that Cameron was going to be hospitalized overnight, her mother told her she was not to stay in appellant's house alone with appellant all night because L.E.'s mother "just had a bad feeling about it, it didn't look right." L.E. replied, "Mom, he's my uncle. That's fine. I can stay here. It's no big deal. He's family." (Tr., 118.)
 {¶ 39} Thereafter, Patty telephoned and indicated that appellant should take L.E. to stay with her and her husband for the night. While appellant was driving L.E. to Patty and Dick's home, and with Dillon sleeping in the back seat, appellant reached over, unbuttoned L.E.'s shorts, and digitally penetrated her. Then he pulled out his penis and asked L.E. to "taste" it. She complied, and appellant repeatedly pushed on her head as she performed fellatio on him for approximately two minutes. After this, appellant dropped L.E. off, and L.E.'s mother picked her up the following day.
 {¶ 40} L.E. next saw appellant on October 20, 2000, when appellant attended a party at L.E.'s home to celebrate the first birthday of L.E.'s youngest sister. She later saw him in May 2001 when L.E., Annita, Putterbaugh, and L.E.'s sisters traveled to Columbus following the birth of appellant and Jodi's youngest son, Jacob. She saw appellant again at a restaurant for a family Thanksgiving celebration in 2001. No sexual activity occurred between the two during any of these visits.
 {¶ 41} Then, on December 29, 2001, L.E. and two of her sisters — 14-year-old Sarah and 12-year-old Anna — drove to appellant's house for an overnight visit. During that visit, appellant entered Cameron's room, where L.E. was sleeping in Cameron's bed. With his two-year-old son lying beside L.E., appellant digitally penetrated her and put his penis in her mouth. This was the last time that the two engaged in sexual conduct. L.E. began attending college in the fall of 2002. She saw appellant on December 28, 2002, in Columbus, for a family Christmas celebration, and this was the last time that she saw appellant.
 {¶ 42} L.E. first told a high school friend of appellant's actions in mid-October 2003, when she was home on break from college. She told her boyfriend in December of that year, and finally told her mother on January 2, 2004. Her mother immediately drove her up to Patty and Dick's home, where she shared all of the details with her mother, Patty, Dick and Jodi. Upon hearing the story, Jodi, who was in the midst of a divorce from appellant, insisted that L.E. press charges against appellant. Jodi contacted the police, whereupon an investigation ensued.
 {¶ 43} On September 10, 2004, the Franklin County Grand Jury indicted appellant on 14 counts of sexual battery, in violation of R.C. 2907.03. Count 1 was based upon digital vaginal penetration alleged to have occurred between July 29, 1999 and August 8, 1999. Counts 2-8 were based upon digital vaginal penetration, fellatio and cunnilingus alleged to have occurred on September 24, 1999 (Counts 2-5) and on September 25, 1999 (Counts 6-8). Counts 9-12 were based upon digital vaginal penetration and fellatio alleged to have occurred between July 12, 2000, and July 18, 2000. Finally, Counts 13 and 14 were based on digital vaginal penetration and fellatio alleged to have occurred on December 30, 2001.
 {¶ 44} The jury returned a verdict of guilty on Count 1 (digital vaginal penetration between July 29, 1999, and August 8, 1999) and Count 2 (digital vaginal penetration on September 24, 1999). The jury acquitted appellant of the charges in Counts 11-14, and were unable to reach a verdict as to Counts 3-10. The trial court sentenced appellant to one year of imprisonment for each count of which he was convicted, with the sentences to be served concurrently.
 {¶ 45} On appeal, appellant asserts four assignments of error for our review, as follows:
I. The Trial Court erred by overruling Defendant's Motion to Dismiss the charges due to an insufficient Indictment.
II. The evidence was insufficient to find the Appellant guilty and thus, Appellant is entitled to a Judgment of Acquittal as to Counts One and Two pursuant to Ohio Rule 29 of the Ohio Rules of Criminal Procedure.
III. Appellant's conviction was against the manifest weight of the evidence.
IV. The Trial Court erred in violation of Appellant's rights to due process and equal protection by failing to properly instruct the jury with regard to the definition of "in loco parentis."
 {¶ 46} We begin with appellant's first assignment of error, in which he argues that the trial court erred in overruling his motion to dismiss/motion for acquittal as to all charges. Appellant made this motion following the opening statement of plaintiff-appellee, State of Ohio ("appellee"), and based the motion upon what he claimed was a defect in the indictment. Specifically, appellant argued that the indictment was defective because it did not state the basic facts upon which appellant's alleged status as "in loco parentis" was based. In the case ofState v. Noggle (1993), 67 Ohio St.3d 31, 615 N.E.2d 1040, at paragraph two of the syllabus, the Supreme Court of Ohio held, "[i]ndictments based upon an alleged offender's status as a person in loco parentis should at least state the very basic facts upon which that alleged status is based."
 {¶ 47} A review of the indictment and the December 22, 2004 bill of particulars reveals that both documents alleged, with respect to each count, that appellant "did engage in sexual conduct * * * with another, to wit: [L.E.], not his spouse, when the said David A. Funk is the said [L.E.'s] natural or adoptive parent, stepparent, guardian, custodian or other person in loco parentis[.]"
 {¶ 48} Crim.R. 7 provides in pertinent part:
(B) Nature and contents. — The indictment shall be signed, in accordance with Crim. R. 6 (C) and (F) and contain a statement that the defendant has committed a public offense specified in the indictment. The information shall be signed by the prosecuting attorney or in the name of the prosecuting attorney by an assistant prosecuting attorney and shall contain a statement that the defendant has committed a public offense specified in the information. The statement may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged. It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. Each count of the indictment or information shall state the numerical designation of the statute that the defendant is alleged to have violated. Error in the numerical designation or omission of the numerical designation shall not be ground for dismissal of the indictment or information, or for reversal of a conviction, if the error or omission did not prejudicially mislead the defendant.
 {¶ 49} Appellant appears to be arguing that because the indictment lacks a statement of the basic facts underlying the allegation that he was in loco parentis with respect to L.E., he did not have sufficient notice of the charges against him and, as a result, was prejudiced in his defense. But Crim.R. 12(C)(2) provides that defenses and objections based upon defects in the indictment must be raised before trial. Appellant never challenged the sufficiency of the indictment at any time prior to trial; therefore, he has waived any argument with respect to alleged defects in the charging instrument. State v. Wooden,
10th Dist. No. 02AP-473, 2002-Ohio-7363, ¶ 10; State v.Mason (Apr. 11, 2002), 10th Dist. No. 01AP-953; State v.Mills (1992), 62 Ohio St.3d 357, 363, 582 N.E.2d 972; State v.Brooks (1996), 75 Ohio St.3d 148, 159, 661 N.E.2d 1030.
 {¶ 50} Having failed to timely object, appellant waived all but plain error. Mason, supra. To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection. See State v. Tichon (1995), 102 Ohio App.3d 758,767, 658 N.E.2d 16. Moreover, plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. State v. Waddell (1996), 75 Ohio St.3d 163,166, 661 N.E.2d 1043. Notice of plain error is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Phillips
(1995), 74 Ohio St.3d 72, 83, 656 N.E.2d 643; State v. Ospina
(1992), 81 Ohio App.3d 644, 647, 611 N.E.2d 989.
 {¶ 51} The record reveals that appellant vigorously defended himself against all charges, and was found guilty of only two of the 14 charges he faced. His claim that he did not have notice of the charges is without merit. Accordingly, we perceive no plain error and overrule appellant's first assignment of error.
 {¶ 52} In his second assignment of error, appellant argues that his convictions are unsupported by sufficient evidence as to all elements of the offense of sexual battery. The Supreme Court of Ohio outlined the role of an appellate court presented with a sufficiency of evidence argument in State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. * * *
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319,99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 53} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983),20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Rather, the sufficiency of evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, supra, at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 80,434 N.E.2d 1356. The reviewing court does not substitute its judgment for that of the factfinder. Jenks, supra, at 279.
 {¶ 54} In the present case, appellant argues that the evidence was insufficient to support a jury finding that he was a person "in loco parentis" with respect to L.E. Our discussion of this assignment of error necessitates an inquiry into the meaning of the Latin term "in loco parentis," as used in R.C.2907.03(A)(5).
 {¶ 55} We are guided by the long-held principle that "when addressing issues of statutory meaning, `[l]egislative intent is the preeminent consideration.'" Gutmann v. Feldman,97 Ohio St.3d 473, 2002-Ohio-6721, 780 N.E.2d 562, ¶ 14, quoting Stateex rel. Wolfe v. Delaware Cty. Bd. of Elections (2000),88 Ohio St.3d 182, 184, 724 N.E.2d 771. Moreover, none of the language employed in a statute should be disregarded and all terms used in a statute should be given their ordinary and usual meaning except where the General Assembly has indicated otherwise. See Weaverv. Edwin Shaw Hosp., 104 Ohio St.3d 390, 2004-Ohio-6549,819 N.E.2d 1079, ¶ 12; Carter v. Div. of Water, City of Youngstown
(1946), 146 Ohio St. 203, 32 O.O. 184, 65 N.E.2d 63.
 {¶ 56} The General Assembly has not defined the phrase "in loco parentis" as used in R.C. 2907.03(A)(5). Any word left undefined by statute is to be accorded its common, everyday meaning. State v. Dorso (1983), 4 Ohio St.3d 60, 62, 4 OBR 150,446 N.E.2d 449. But the Latin phrase "in loco parentis" is not a common, everyday phrase; rather, it is a legal term which, literally translated means "in the place of a parent." "The ordinary meaning of a person standing in loco parentis would, therefore, seem to be a person standing in the relation of, or assuming the relation of a parent to another." Thomas v. UnitedStates (C.A.6, 1951), 189 F.2d 494, 497.
 {¶ 57} In the case of State v. Noggle (1993),67 Ohio St.3d 31, 615 N.E.2d 1040, the Supreme Court of Ohio took up the issue of the meaning of "in loco parentis" as used in former R.C.2907.03(A)(5). The sole issue presented to the court in that case was whether a high school teacher and coach stood in loco parentis with respect to a student with whom he had allegedly engaged in sexual conduct. In Noggle, the applicable version of the statute was that originally enacted in 1974. That version included no specific imposition of liability for sexual conduct between teachers and students. Without the benefit of such specific legislative provisions, the court endeavored to ascertain whether the phrase "in loco parentis," as used in the applicable version of the statute, intended to include a high school teacher and coach.
 {¶ 58} In the course of its discussion, the court stated that, "R.C. 2907.03(A)(5) was quite obviously designed to be Ohio's criminal incest statute. The traditional family unit has become less and less traditional, and the legislature wisely recognized that the parental role can be assumed by persons other than biological parents, and that sexual conduct by someone assuming that role can be just as damaging to a child." Id. at 33. The court went on to note that the dictionary definition of "in loco parentis" is "`charged, factitiously, with a parent's rights, duties, and responsibilities.'" Ibid., quoting Black's Law Dictionary (6 Ed. 1990) 787. From this definition, the court gleaned that, "[a] person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding. A person `in loco parentis' was grouped with guardians and custodians in the statute because they all have similar responsibilities." Ibid.
 {¶ 59} The court determined that, in enacting R.C. 2907.03, "[t]he General Assembly envisioned a variety of specific situations where an offender might take unconscionable advantage of a victim." Ibid. Noting that the language of the statute very specifically forbade sexual conduct between prison workers and inmates, as well as hospital workers and patients, but made no specific mention of teachers and students, the court concluded that the term "in loco parentis," as used in the statute, did not include the teacher-student relationship because, "[h]ad the General Assembly sought to forbid sexual conduct between teachers and students, it would have done so specifically." Ibid.
 {¶ 60} The court explained that "[t]he phrase `person in loco parentis' in R.C. 2907.03(A)(5) applies to a person who has assumed the dominant parental role and is relied upon by the child for support." Ibid. Finding that, as such, the statutory provision was not designed for teachers, coaches and the like, the court refused to construe the statute expansively so as to include teachers and coaches, absent an express legislative pronouncement that such individuals were indeed included. The court emphasized that R.C. 2901.04(A) instructs courts to strictly construe criminal statutes against the state and to liberally construe them in favor of the accused.
 {¶ 61} The General Assembly responded to the Noggle court's exercise of judicial restraint by amending R.C. 2907.03. Through the passage of H.B. 454, which became effective on July 19, 1994, the legislature added subparagraphs (7) and (8) so as to explicitly impose liability upon teachers, coaches, administrators and other persons in authority employed by a school or institution of higher education when the alleged victim is enrolled in or attends that school or institution. The legislature also added subparagraph (9), which includes within those that may be held liable for sexual battery of a minor anyone who is the minor's athletic or other type of coach, instructor, or leader of a scouting troop, "or [who] is a person with temporary or occasional disciplinary control over the [minor]."
 {¶ 62} Notwithstanding these additions, the current version of the statute contains no more precise a definition of "in loco parentis," for purposes of deciding the present appeal, than that which guided the Noggle court. Appellant was not L.E.'s teacher or coach. He and his wife were part of L.E.'s extended family and the principals of the household that L.E. visited on the various occasions she described during her testimony. We must ascertain the meaning of the phrase "in loco parentis" as applied to the particular set of facts present in this case in order to determine whether appellee presented sufficient evidence that appellant stood in loco parentis with respect to L.E.
 {¶ 63} Other than the decision of the Supreme Court of Ohio in Noggle, our research revealed little discussion by Ohio appellate courts as to the meaning and import of the phrase "in loco parentis" as the same is used in R.C. 2907.03. In State v.Reinhardt, 10th Dist. No. 04AP-116, 2004-Ohio-6443, this court dealt with a direct appeal of the defendant's conviction on several counts, including two counts of sexual battery in violation of R.C. 2907.03(A)(5), arising from the defendant's sexual conduct with the daughter of his live-in girlfriend. The defendant challenged the sufficiency of the evidence that he stood in loco parentis with respect to the victim. This court followed Noggle, and determined that the defendant was "the dominant parent" and provided "support" for the child even though he made no monetary contribution to the household, because he was the daytime caregiver for the victim during her mother's 12 and one-half hour shifts at work. Because Noggle directs that the classification of "in loco parentis" "applies to the people the child goes home to," we held, the defendant fit this description notwithstanding the fact that the victim's mother was home in the evenings. Id. at ¶ 34.
 {¶ 64} In the case of Evans v. The Ohio State Univ. (1996),112 Ohio App.3d 724, 680 N.E.2d 161, this court examined the issue whether an "in loco parentis" relationship existed between the plaintiff's minor daughter and the university-sponsored 4-H organization, such that the relationship imposed a duty upon the 4-H organization to protect the plaintiff's daughter from sexual abuse by her 4-H advisor. Relying on Noggle, the Court of Claims had found that no such relationship existed. The court of appeals held that, "[t]he key factors of an in loco parentis relationship have been delineated as `the intentional assumption of obligations incidental to the parental relationship, especially support and maintenance.'" Id. at 736, quoting NovaUniv., Inc. v. Wagner (FL. 1986), 491 So.2d 1116, 1118, n. 2.
 {¶ 65} In Slagle v. White Castle Systems, Inc. (1992),79 Ohio App.3d 210, 607 N.E.2d 45, jurisdictional motion overruled by (1992), 65 Ohio St.3d 1420, 598 N.E.2d 1170, this court had occasion to decide whether an employer owed a special duty of care and protection toward an employee by virtue of the employee's status as a minor. We sought guidance from 12 Restatement of the Law 2d, Torts (1965) 118, Section 314A(4), which provides, "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." In other words, when "A" voluntarily takes custody of "B," and by this taking removes "B" from the custody of "C," who was charged with protecting "B," then "A" has an obligation to care for and protect "B" in the same manner in which "C" would have been required to do so.
 {¶ 66} The Slagle court explained that this section of the Restatement "recognizes that one who voluntarily takes custody of another is under a duty to protect the other against unreasonable risks of harm." Slagle, supra, at 217. The court went on as follows:
When a person accepts custody of a child, that person standsin loco parentis to the child, accepting all the rights and responsibilities that go with that status. As it involves the ultimate physical and legal control of another, a custodial relationship is not entered into lightly. One who accepts custody of a child must voluntarily assume the duties and responsibilities of a parent towards that child.
Ibid.
 {¶ 67} Though the Slagle court found that no custodial relationship existed in that case, it did leave open the possibility that a plaintiff could establish the existence of such a relationship upon "proof that the employer voluntarily assumed the additional responsibilities of a custodian towards the child." Ibid.
 {¶ 68} In the case of State v. Hayes (1987),31 Ohio App.3d 40, 31 OBR 56, 507 N.E.2d 1176, the First Appellate District was confronted with a facial vagueness challenge to R.C.2907.03(A)(5). Specifically, the defendant argued that the statute was facially unconstitutional because of the statute's use of the phrase "in loco parentis." The Hayes court noted that the literal translation of the phrase is "person in place of a parent." The court also determined that, under the doctrine of ejusdem generis,[1] the phrase "acquires an ascertainable and intelligible meaning" because it "is the last of a series of descriptive words; it follows after `natural or adoptive parent, or a stepparent, or guardian, [or] custodian.'" Id. at 43.
 {¶ 69} Thus, the court held, "[t]he meaning is that one of the relationships in which sexual conduct is prohibited is the one between a child or younger person and an older person that resembles ("is like") the relationship children have with their biological parents. That relationship may be described, in varying degrees, as close, supportive, protective, authoritative, and continuous." Ibid.
 {¶ 70} This close, supportive and protective relationship need not, however, include provision for the material needs of the child. In an oft-cited scholarly opinion about the meaning of the phrase "in loco parentis" as used in the National Service Life Insurance Act, the United States Court of Appeals for the Sixth Circuit in Thomas v. United States (C.A.6, 1951),189 F.2d 494 noted "[t]he offices and duties of a parent are * * * `infinitely various.' Some have no connection whatever with making provision for the child; and many of the benefits of such a relationship, under given circumstances, would be much more important than the making of such provision. * * * Some of the most worthwhile, precious and cherished things in one's life may come therefrom, wholly separate and apart from rights of support and maintenance * * *." Id. at 497.
 {¶ 71} Numerous other federal authorities have concluded that the assumption of the in loco parentis relationship is primarily a question of intention, which is shown by the "acts, conduct and declaration of the person [allegedly standing] in that relationship." Leyerly v. United States (C.A.10, 1947),162 F.2d 79, 85. See, also, Banks v. United States (C.A.2, 1959),267 F.2d 535; Meisner v. United States (W.D.Mo. 1924), 295 F. 866; Miller v. United States (C.A.8, 1942), 123 F.2d 715.
 {¶ 72} With the foregoing authorities in mind, we must review the evidence adduced at trial to determine whether appellee produced sufficient evidence on the issue of "in loco parentis" status to warrant a jury determination on the charges of sexual battery. Of particular importance to our inquiry is the testimony of L.E., detailed hereinabove, as well as the testimony of appellant and that of L.E.'s mother, Annita.
 {¶ 73} On direct examination, L.E. testified that "David and Jodi" were in charge of her during her visits to Columbus. They would have disciplined her had she misbehaved during any of the trips. They would have taken care of her had she injured herself or become ill during any of these trips.
 {¶ 74} On cross-examination, she testified that, at the time of the events subject of the indictment, she was enrolled in high school in Kentucky, she received her mail in Kentucky, she had a doctor in Kentucky, most of her belongings stayed in Kentucky, she received a driver's license in Kentucky, and she listed her Kentucky home address on her passport. She further testified that neither appellant nor Jodi ever held her out to others as their daughter.
 {¶ 75} L.E.'s mother, Annita, also testified at trial. She explained her recollection of the circumstances surrounding L.E.'s first visit to appellant's home. She testified that during the July 1999 family gathering at Patty and Dick's home, Annita asked Patty and Jodi to talk with L.E. Patty later advised Annita that she and Jodi thought it would be a good idea for L.E. to "get away for a while." Appellant and Jodi told Annita that L.E. would be welcome at their house anytime, and L.E. asked to go. Annita testified that she allowed the visit because L.E. was "having such a hard time dealing with * * * the divorces [meaning Annita's divorce from L.E.'s father and Putterbaugh's divorce from his wife] * * *." (Tr., 364.)
 {¶ 76} She further explained this on cross-examination, when she stated that she thought it would be a good idea for L.E. to visit appellant and Jodi so that L.E. "could intermingle with her family." (Tr., 345.) Annita also felt it would be good for L.E. to "share her experience with other people who had shared * * * the same divorce problems." (Tr., 364.)
 {¶ 77} After the first visit, L.E. "seemed like she was doing a little better. She seemed like she had befriended — I kept hearing about Uncle David and Aunt Jodi. And she did want to go back. She was pretty excited about it, and I was relieved that maybe somebody could relate to her and maybe help her out." (Tr., 299-300.) She also seemed fine upon returning from her September 1999 visit. After that second visit, "it was very obvious that David Funk was a very special person to her. David Funk was someone she talked about a lot. He meant a lot to her." (Tr., 304.)
 {¶ 78} Annita testified that during L.E.'s visits at appellant's house, appellant and Jodi were responsible for her well-being. When asked who would have been responsible for disciplining L.E. if she got in trouble during a visit, Annita stated that appellant and Jodi would, but added that she could "hardly see [L.E.] getting in trouble." (Tr., 299.) When asked whether she attempted to place any rules or restrictions upon L.E. during her visits to appellant's home, Annita testified that she "would just tell her to behave. And she would look at me and say, `Mom, you don't have to tell me that.'" (Tr., 308.)
 {¶ 79} On cross-examination, Annita agreed that when L.E. visited Columbus, Annita expected L.E. to "abide by [Annita's] rules then too[.]" (Tr., 338.) However, also during cross-examination, in response to questioning about whether she knew that L.E. spent several days at Patty and Dick's lakeside trailer during L.E.'s July 1999 visit to Columbus, Annita said, "Well, I assume that when she's with Jodi and David and they're making plans, they don't have to call me every time and fill me in. I give my — I trust that she's in their care." (Tr., 347.)
 {¶ 80} During the family's attendance at the October 1999 "landing party" at Lake Saint Marys, Annita was disconcerted to observe L.E. sit on appellant's lap while the family was gathered around a campfire. Annita believed that this behavior was inappropriate for a girl L.E.'s age, and "felt sorry for [L.E.], because I felt like she was embarrassing herself." (Tr., 302.) Annita further explained, "I don't think she had a clue that it was not appropriate behavior. And I was shocked, like I couldn't believe my daughter would act that way. That was the first time I ever saw her act that way ever." (Id.) When the family returned home, Annita told L.E. that she noticed the behavior and thought it was inappropriate. L.E. replied, "`Okay, Mom. I — I understand.'" (Tr., 304.) When asked why Annita allowed L.E. to visit at appellant's home after that incident, Annita explained, "Because I understand that that behavior is pretty normal in an infatuated little girl, and I decided that I've talked to her. She's given me the sign that she's heard what I said, and it's not a problem." (Id.)
 {¶ 81} During the family's 1999 Thanksgiving celebration held at Annita's home, Annita noticed other changes in L.E. that concerned her. L.E. exhibited an obvious eagerness to please appellant and to impress him, beyond the usual well-mannered way in which L.E. would treat guests. Annita also noticed that L.E. and appellant would sit alone together "way too many times" during that gathering. (Tr., 310.) She described them as behaving "like two school children." (Id.) Moreover, although L.E. would normally dress casually and in a manner befitting a child who worked outside with her goats, she would wear makeup, perfume and revealing clothing whenever appellant was present. The only times that Annita observed these behaviors was when appellant was coming for a visit or when L.E. was anticipating traveling to appellant's home for a visit.
 {¶ 82} When Annita brought all of these concerns to her daughter's attention, L.E. became very defensive and would try to convince Annita that she was "being ridiculous." (Tr., 311.) When asked why Annita continued to allow L.E. to visit appellant's home, she explained:
Well, after the 2000 visit of July when I had to go up there and get her — when she wanted to stay there and didn't think that it would be wrong, it would be fine, I decided that the only way to keep her from that situation would be to control her on my end * * * To keep her home.
(Tr., 313.)
 {¶ 83} Nonetheless, Annita allowed L.E. to return to appellant's home for a visit roughly 18 months later, in December 2001. The impetus for the visit was that L.E., who had been hesitant to test for her driver's license, had finally obtained her license when she was nearly 18 years old. L.E. was on Christmas vacation and asked permission to drive herself up to Columbus to visit with Jodi and appellant. Annita continued:
And, so, I decided, you know, she's my first; and I've been real protective of her. Maybe I need to let her do this. And they had been inviting her. And I decided — you know, I still had the concerns about sending her there; but I thought that if I sent three of them together, I know I had two of them that was going to come back and tell, that was going to raise the roof if anything happened.
(Tr., 314.)
 {¶ 84} She was sure that the other two girls would tell her if anything inappropriate occurred because they had "expressed disgust" with L.E.'s behavior and had teased her about it; and also because "David Funk was someone that intimidated the girls." (Tr., 315.) He would tease them and "pick, pick, pick" at them. When the girls returned from the December 2001 overnight visit to appellant's home, the two younger sisters told Annita that L.E. had "overruled them there and made them go to bed while she stayed up with David Funk." (Tr., 317.) After that, there were no more such visits. When asked on direct examination "[w]as that your decision?" Annita replied "yes." (Id.)
 {¶ 85} On January 2nd or 3rd, 2004, when L.E. was home from college for Christmas break, Annita found L.E. sitting at the kitchen table crying, after having returned home from her first visit to a gynecologist. Upset that her daughter was crying and that she and L.E. had grown apart over the previous several years, Annita said, "what happened to us, [L.]? * * * You used to come to me and tell me everything. And I've noticed behavior in you in decline and your personality and demeanor. It really worries me." (Tr., 324.) L.E. asked "What do you mean?" Annita continued:
And by this time, I had enough red flags that I just was going to put it point-blank to her. I said, "What did David Funk do to you?"
At that point, my daughter took her hair in front of her face. She was sitting there like this, crying.
I asked her, "What happened, [L.]?"
(Tr., 325.) L.E. told Annita what happened, and afterward Annita "was floored. I mean I was heartbroke. I didn't know what to do." (Tr., 326.)
 {¶ 86} Appellant testified on his own behalf. He testified that, throughout the time period pertinent to this case, he was employed as a construction project manager. Because so much construction is done during the summer months, appellant, related, he worked 10- to 12-hour days during the summer. He recalled that Dillon and Cameron were "extremely active" young boys and that their attention spans were "all over the place." He also detailed the floor plans of the two homes in which L.E. had visited him and Jodi, as well as the layouts of the interior of his vehicles. He testified that many of the sexual activities to which L.E. had testified either could not have happened at all or could not have happened without Jodi or one of the children observing them.
 {¶ 87} Appellant denied that he invited L.E. to spend time at his home in July 1999; rather, he testified that Jodi merely informed him of the upcoming visit. He testified that he never established rules with which L.E. was required to abide during her stays, and he never disciplined L.E. He never took L.E. anywhere on his own during her visits. He never held her out as his daughter, never took her to the doctor and never allowed her to drive his vehicles.
 {¶ 88} Appellant testified that, on the first night of her stay in July 1999, L.E. shared with him and Jodi the problems she had been experiencing at home, as well as social problems she faced at school. He stated that he and Jodi listened to L.E., and appellant reassured her that such problems were not uncommon and that if she were patient, her social situation would probably improve. He said that the three stayed up until 10:30, whereupon Jodi went to bed. According to appellant, he watched television until approximately 11:00 pm., and then went to bed. He said he heard L.E. go to bed a short time later. Appellant testified that this first night was the only night during L.E.'s July 1999 visit that he stayed up late with her. He denied ever being outside alone with L.E. during this visit.
 {¶ 89} Appellant stated that L.E. never sat on his lap while he and his family attended the gathering at Lake Saint Mary. He denied ever having sat alone with L.E. while visiting L.E.'s home at Thanksgiving in 1999. He denied that L.E. accompanied him to fill his truck's tires during that visit; in fact, he denied ever going out to fill his tires with air during that trip. He testified that when he drove L.E. to his mother-in-law's home after Cameron was admitted to the hospital in September 1999, his sister, Rebecca, accompanied him and L.E.
 {¶ 90} Appellant denied having ever kissed or touched L.E. in a sexual manner, on any of the occasions that L.E. related during her testimony, or on any other occasions. He further denied ever having inappropriate conversations with L.E.
 {¶ 91} Appellant argues that his convictions must be reversed because appellee presented insufficient evidence that appellant stood in loco parentis with respect to L.E. He argues thatNoggle's reference to the "people the child goes home to" suggests that the concept of in loco parentis embodies a permanency, or at least an indefiniteness, with respect to the duration of the relationship between the victim and perpetrator. Because the alleged sexual batteries occurred when L.E. was merely visiting appellant and his wife for time periods ranging from one night to two weeks, he contends that the requisite showing of permanence or indefiniteness has not been made.
 {¶ 92} He also argues that the evidence was insufficient to demonstrate that he had decision-making authority with respect to disciplining L.E. during her visits, and that the evidence demonstrated that, as between appellant and his wife, it was Jodi who occupied the dominant parental position during the visits because she spent significantly more time with L.E. than did appellant.
 {¶ 93} First, we do not agree with appellant's position that we should require evidence of permanence or indefiniteness in determining whether appellee has established that appellant stood in loco parentis to L.E. There is nothing in R.C. 2907.03(A)(5) that places a temporal restriction on the in loco parentis status of a defendant, or on the relationship giving rise to such status, and the Supreme Court of Ohio has not pronounced that such a requirement exists. The statute also includes no requirement that one who is in loco parentis to the child be a blood relative or related to the child by marriage.
 {¶ 94} Moreover, although the parent-child relationship is permanent, and there is certainly a permanent or, at the very least, indefinite quality to the grandparent-grandchild and stepparent-stepchild relationships, the "in loco parentis" relationship, as discussed in Noggle, appears to be less susceptible of precise temporal definition. Indeed, guardians and custodians, who take the place of a parent, can and often do fill this role on a temporally limited basis as dictated by the very circumstances that occasioned the inception of the relationship in the first instance.
 {¶ 95} We also reject the proposition that because L.E. was "merely a visitor" appellant could not acquire in loco parentis status with respect to her. In State v. Dye (1998),82 Ohio St.3d 323, 695 N.E.2d 763, the Supreme Court of Ohio determined that when a caregiver rapes a child in his care, he can be convicted of rape of that child with force, without evidence of an express threat of harm or significant physical restraint. Significantly, the court equated the force that a non-parent caregiver can exert upon a child, for purposes of taking sexual advantage of the child, with the type of force and authority that the child's parents are capable of exerting. The court stated, "when parents tell their children that the caregiver is in charge and that the children should mind the caregiver, that caregiver occupies the same position of authority as the parent traditionally would." Id. at 329.
 {¶ 96} As a result, the Dye court determined that when non-parental authority figures who are caring for a child in the absence of that child's parents exercise their dominance and authority, then the youth and vulnerability of the child, coupled with the power inherent in the non-parent's position of authority, creates a situation of such dominance and control that, in a prosecution against the caregiver for rape pursuant to R.C. 2907.02(A)(2), evidence of explicit threats and significant physical restraint is not necessary to prove the required element of force or threat of force. See, also, State v. Byrd (Feb. 21, 2002), 8th Dist. No. 79661, discretionary appeal not allowed (2002), 95 Ohio St.3d 1487, 769 N.E.2d 403 (applying Dye to rape conviction involving conduct committed by victim's uncle by marriage during victim's visits to uncle's home); State v.Cullers (Nov. 9, 2001), 2nd Dist. No. 18602, discretionary appeal not allowed (2002), 94 Ohio St.3d 1487, 763 N.E.2d 1185
(applying Dye to victims' male adult babysitter); State v.Tebcherani (Nov. 22, 2000), 9th Dist. No. 19535, discretionary appeal not allowed (2001), 91 Ohio St.3d 1481,744 N.E.2d 1194 (applying Dye to victim's female adult babysitter).
 {¶ 97} As the court in Noggle noted, at page 33 of that opinion, R.C. 2907.03 seeks to punish sexual conduct "in a variety of situations where the offender takes unconscionable advantage of the victim." 1974 Committee Comment to H.B. 511. Such situations include those in which a non-parent caregiver, with whom a child has been entrusted for any length of time, takes advantage of the authority he possesses in the absence of the child's parents, to engage in sexual conduct with the child.
 {¶ 98} In this case, the evidence demonstrated that L.E.'s mother, Annita, entrusted appellant and his wife with L.E. because L.E. "was having such a hard time" and because Annita thought it would be good for L.E. "to intermingle with her family" and to "share her experience with other people who had shared * * * the same divorce problems." During the first visit, L.E. shared with Jodi and appellant some of the details of the problems in her life, and appellant admittedly listened and offered advice and encouragement. After this first visit, Annita testified, "it was very obvious that David Funk was a very special person to [L.E.]." Annita testified that she "trust[ed] that she's in their care."
 {¶ 99} If believed, the evidence presented in this case supports the conclusion that appellant, or as L.E. referred to him in conversation with her mother, "Uncle David," used the fact that L.E. was in his home, staying overnight, with her parents not immediately available, along with his position as "a very special person" with the same type of parental authority discussed in Dye, to take advantage of L.E. and manipulate her into submitting to his sexual advances. This evidence is sufficient proof of the element of "in loco parentis" status, notwithstanding the fact that, as appellant points out, all incidents of L.E.'s permanent residency (e.g., attendance at school and doctor appointments, receipt of mail, obtaining a driver's license, etc.) were sited in her mother's home in Kentucky. Accordingly, we overrule appellant's second assignment of error.
 {¶ 100} In his third assignment of error, appellant argues that his convictions were against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v.DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction."Thompkins, supra, at 387.
 {¶ 101} Appellant's arguments under this assignment of error are much the same as those under his second assignment of error. He argues that the jury's finding that he stood in loco parentis with respect to L.E. was against the manifest weight of the evidence. We disagree. In our view, the jury did not lose its way in making such a finding, and this is not a case in which the evidence weighs heavily against that finding. Accordingly, appellant's third assignment of error is overruled.
 {¶ 102} In his fourth and final assignment of error, appellant argues that the trial court erred when its instructions to the jury included only a portion of the definition of "in loco parentis" that appellant had requested the court to give.
 {¶ 103} "It is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." State v. Sneed (1992), 63 Ohio St.3d 3, 9,584 N.E.2d 1160. "The refusal to give requested jury instructions is reversible error only if the instructions are a correct statement of law, not covered by other instructions and the failure to give the instructions impaired the theory of the party requesting them." State v. Shahan (Mar. 12, 1998), 10th Dist. No. 97APC08-1107, 1998 Ohio App. LEXIS 932, at *22.
 {¶ 104} It is within the trial court's discretion, however, to refuse to give proposed jury instructions that are either redundant or immaterial to the case. Bostic v. Connor (1988),37 Ohio St.3d 144, 524 N.E.2d 881, paragraph two of the syllabus. Moreover, the trial court need not give a defendant's requested instructions to the jury verbatim; rather, the court may use its own language to communicate the same legal principles. Sneed,
supra, at 9.
 {¶ 105} In the present case, the trial court gave the following instruction to the jury with respect to the in loco parentis element of the charges:
In loco parentis means standing in the place of a parent or assuming parental duties or responsibilities. A person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding. The phrase "in loco parentis" applies to a person who has assumed the dominant parental role and is relied upon by the child for support. Simply put, the statute applies to the people the child goes home to.
(Tr., 668.)
 {¶ 106} Appellant requested that the court add the following language to this instruction:[2]
[1.] The term in loco parentis means charged, factitiously, with a parent's rights, duties, and responsibilities. [2.] A person in loco parentis was grouped with guardians and custodians in the statute because they all have similar responsibilities. [3.] This statutory provision was not designed for teachers, coaches, scout leaders, or any other person who might temporarily have some disciplinary control over a child.
 {¶ 107} During its deliberations, when the jury asked the court for a clearer definition of the term "in loco parentis" the court told the jury that it already had the complete definition. The jury then asked for a copy of the instruction and for a dictionary. The court refused to give the jury a dictionary. The jury reached its verdict the following afternoon.
 {¶ 108} Appellant points out that the additional instruction that he requested is taken verbatim from the opinion of the Supreme Court of Ohio in Noggle. Thus, he argues, it is an accurate statement of the law. Moreover, he contends, it is not redundant or immaterial, and is not covered by the rest of the instruction given as to "in loco parentis" status. Appellant argues that the most prejudicial effect of the trial court's omission to give the requested instruction was that, even when viewed in a light most favorable to appellee, the evidence demonstrated that appellant had, at best, some temporary disciplinary control over L.E., but not the same rights and responsibilities that a guardian or custodian would have.
 {¶ 109} In response, appellee argues that the court's refusal to give appellant's requested instruction was not prejudicial error because the requested instruction is substantially similar to the instruction that the court gave. For example, "charged, factitiously, with a parent's rights, duties, and responsibilities" has substantially the same meaning as "standing in the place of a parent or assuming parental duties or responsibilities." Also, "grouped with guardians and custodians in the statute because they all have similar responsibilities" has substantially the same meaning as "the same duties as a guardian or custodian, only not through a legal proceeding." We agree with appellee that sentences number one and number two of the requested instruction were redundant because they were covered by other language already included in the court's instructions.
 {¶ 110} Finally, appellee argues that it would have been legally wrong for the court to instruct the jury with sentence number three of the requested instruction, to wit: "this statutory provision was not designed for teachers, coaches, scout leaders, or any other person who might temporarily have some disciplinary control over a child," because all such persons are covered under subparagraphs (7), (8) and (9) of R.C. 2907.03(A), and the only charges before the jury were brought pursuant to subparagraph (5).
 {¶ 111} Requested sentence number three is taken fromNoggle. In that case the indictment returned against the defendant alleged that an in loco parentis relationship existed between the defendant and the alleged victim, but stated no facts specifying the nature or underlying basis of the relationship. The amended bill of particulars alleged that the defendant was "a person in loco parentis by virtue of his position as a teacher and school coach * * *." Noggle at 31. The trial court dismissed the indictment, holding that a teacher and coach is not, as a matter of law, a person in loco parentis for purposes of the sexual battery statute. The court of appeals affirmed the dismissal.
 {¶ 112} Thus, the case came before the high court with no evidence having been adduced, and the court was presented with the very narrow issue of whether, solely by virtue of a person'soccupation as a teacher and coach, that person holds the status of in loco parentis. The court noted that although the legislature had seen fit to specifically include within the statute's ambit prison workers who abuse prisoners and hospital workers who abuse patients, it did not specifically include teachers; this, the court concluded, the General Assembly could easily have done. The court refused to bring teachers and coaches into the definition of "in loco parentis" in the absence of any expression of legislative intent to impose liability upon those groups under the sexual battery statute.
 {¶ 113} The court found that being a teacher or coach,without more, is insufficient to confer in loco parentis status because when one merely has some degree of temporary disciplinary control over children by virtue of one's position as a teacher, coach or scout leader, this, alone, is insufficient to put that teacher, coach or leader "in place of a parent," which is the literal translation of "in loco parentis." The court concluded that something more than the bare assertion that a defendant follows a profession involving temporary control over others is required; thus, the court said, "[b]eing a teacher, for purposes of this statute, is no more relevant than being a firefighter, an accountant, or a flight attendant." Noggle, at 34.
 {¶ 114} It was this concept, driven by the paucity of facts underlying the allegation that the defendant was in loco parentis, which led the Noggle court to state that R.C.2907.03(A)(5) "was not designed for teachers, coaches, scout leaders, or any other persons who might temporarily have some disciplinary control over a child." Noggle at 33. But this phrase does not mean that those who do occupy the status of in loco parentis with respect to an alleged victim will never have temporary disciplinary control over that victim.
 {¶ 115} If the trial court in this case had included the third requested sentence, this would have led the jury to believe that, as a matter of law, if a person has temporary disciplinary control over a child, then that person cannot be in loco parentis with respect to that child. But this is simply not true. Guardians, custodians, grandparents, and other persons "in loco parentis," all of which are among those statuses enumerated in R.C. 2907.03(A)(5) often have temporary disciplinary control over the relevant person. This simple fact does not remove them from the ambit of the statute because the temporary disciplinary control is not the thing that confers the status. As Noggle
counsels, something more is required in order to occupy the position of in loco parentis. But such control does not disqualify an individual from occupying this position.
 {¶ 116} In other words, the existence of temporary disciplinary control, standing alone, is irrelevant to a jury's determination of whether a defendant stood in loco parentis to an alleged victim. If the trial court had included within its definition of "in loco parentis" appellant's requested sentence number three, this would have been tantamount to an instruction that the jury must acquit appellant if it found that he had ever had temporary disciplinary control over L.E. That is simply an incorrect and misleading statement of the law; thus, the trial court did not commit error in refusing to give it.
 {¶ 117} We also find that the trial court's instruction as to the definition of "in loco parentis" was a correct and complete statement of the law. Accordingly, we find no abuse of discretion in the court's charge to the jury or in its refusal to include appellant's requested language. For these reasons, appellant's fourth assignment of error is overruled.
 {¶ 118} Having overruled all of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Klatt, P.J., and French, J., concur.
[1] "Under the canon of statutory construction commonly referred to as ejusdem generis (literally, "of the same kind"), whenever words of general meaning follow the enumeration of a particular class, then the general words are to be construed as limited to those things which pertain to the particularly enumerated class." Akron Home Med. Servs., Inc. v. Lindley
(1986), 25 Ohio St.3d 107, 109, 25 OBR 155, 495 N.E.2d 417.
[2] We have numbered these sentences in order to facilitate our separate discussion of them.